IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD OF                    )
CENTRAL NORTH CAROLINA,                  )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        1:11CV531
                                         )
LANIER CANSLER, in his official          )
capacity as the Secretary of the         )
North Carolina Department of             )
Health and Human Services,               )
                                         )
                    Defendant.           )

FILED
AUG 1 9 2011
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By

## ORDER

This matter is before the Court on a Motion for Preliminary Injunction [Doc. #3] filed

by Plaintiff Planned Parenthood of Central North Carolina ("Plaintiff" or "PPCNC"), seeking

to enjoin Defendant Lanier Cansler ("Cansler" or "Defendant"), in his official capacity as the

Secretary of the North Carolina Department of Health and Human Services, from enforcing

Section 10.19 of North Carolina Session Law 2011-145. As discussed below, Section 10.19

prohibits the North Carolina Department of Health and Human Services ("DHHS") from

providing state or federal funds to Planned Parenthood, Inc. and its affiliated organizations,

including PPCNC. Given the nature of this action, the Court is compelled to note at the outset

that this case does not in any way involve funding for abortion services. Instead, as discussed

at length below, this action involves legislation that resulted in PPCNC being excluded from

receiving otherwise available funding for contraceptive and teen pregnancy prevention programs.

As a result, PPCNC contends that it will be forced to cease providing free or low-cost

contraceptives for low-income women, lay off staff members who are responsible for teaching the teen pregnancy prevention program, and close a clinic in Durham, North Carolina that currently provides health services and contraceptives for low-income women. This matter came before the Court for a hearing on August 10, 2011. For the reasons set out herein, the Motion for Preliminary Injunction will be granted.

I.    FACTUAL BACKGROUND

PPCNC operates three health clinics in North Carolina, located in Durham, Chapel Hill, and Fayetteville. PPCNC provides abortion services at certain of its facilities, but also provides non-abortion-related family planning health services as well. These non-abortion-related services, which are provided at each of the clinics, include cancer screenings (pap smears and breast exams); tests for diabetes, anemia, and high cholesterol; testing and treatment for sexually-transmitted infections; colposcopies; and contraceptives. Since 2001, PPCNC has received grants and contracts, administered through DHHS, for certain of these non-abortion-related health services. Specifically, this funding includes Title X funding, which is federal funding under 42 U.S.C. § 300 for family planning services for low-income women. The Title X funding provides $125,000 annually for PPCNC's Latino Family Planning Outreach Project at the Durham clinic, a project designed to provide family planning services, contraception, and similar health services to low-income, uninsured Latino clients. PPCNC has also received $75,000 annually in funds under the Teen Pregnancy Prevention Initiative, which includes federal block-grant funds as well as state funds earmarked for the State's Adolescent Pregnancy Prevention Project. This funding supports PPCNC's adolescent pregnancy prevention program for

2

residents of Cumberland County. Finally, PPCNC also receives $12,000 annually under a state-funded Women's Health Service Fund Grant, which funds PPCNC's program to provide long-acting contraceptives to low-income women in Durham County, Orange County and Cumberland County who are not eligible for Medicaid.

In the present suit, PPCNC contends that as a result of recent legislation, PPCNC will be prohibited from receiving the funds already allocated for these non-abortion-related programs. The contested statutory provision is included in North Carolina Session Law 2011-145, enacted into law on June 15, 2011, over the veto of North Carolina Governor Beverly Perdue. The Session Law itself is an appropriations law for fiscal years 2011-2012 and 2012-2013. The Session Law included various budget provisions, and also included a separate provision, Section 10.19, that did not reduce funding for any particular program, but instead specifically prohibited only Planned Parenthood, Inc. and its affiliates from receiving any funding for programs administered by DHHS. The entire provision reads as follows:

**PROHIBIT USE OF ALL FUNDS FOR PLANNED PARENTHOOD ORGANIZATIONS - SECTION 10.19. For fiscal years 2011-2012 and 2012-2013, the Department of Health and Human Services may not provide State funds or other funds administered by the Department for contracts or grants to Planned Parenthood, Inc., and affiliated organizations.**

This Section did not cut funding across the board for certain women's health or low-income health services, and does not have any budgetary impact for the state. Moreover, Section 10.19 did not address funding for abortion services, as funding for abortion services is already limited by state and federal law. See 42 U.S.C. § 300a-6 (prohibiting the use of Title X funds "in programs where abortion is a method of family planning"); N.C. Sess. Laws 2011-145 § 29.23(a)

3

(prohibiting the use of state funds for most abortions). Instead, Section 10.19 provides that for funding that will otherwise continue for certain non-abortion-related state and federal health programs, Planned Parenthood is specifically prohibited from receiving that funding. Thus, any other entity could still receive funding for these programs, but Planned Parenthood, Inc. and its affiliated organizations cannot, solely because of the operation of Section 10.19.

Plaintiff contends that this section affects PPCNC's Title X funding, the Teen Pregnancy Prevention Grant, and the Women's Health Grant. Plaintiff has presented evidence to establish that prior to the passage of Session Law 2011-145 containing Section 10.19, DHHS had preliminarily approved funding for at least two of these programs to PPCNC. Specifically with respect to Title X funding, Plaintiff has presented evidence to establish that in November 2010, as the result of a competitive contracting process, DHHS informed PPCNC that PPCNC's application was approved for funding in the amount of $125,000, effective July 1, 2011 for fiscal year 2011-2012. Plaintiff notes that Defendant has access to this federal funding even now, but the $125,000 is not being provided to PPCNC solely due to Section 10.19. Likewise with respect to the Women's Health Grant, Plaintiff has presented evidence to establish that on May 20, 2011, as the result of a competitive contracting process, DHHS provided PPCNC with a preliminary contract for $12,000 for the Women's Health Services Project for the 2011-2012 year. Plaintiff notes that this funding has now been allocated for its intended purpose and is available to Defendant Cansler, but the $12,000 is not being provided to PPCNC solely due to Section 10.19. In addition, with respect to the Teen Pregnancy Prevention Program, PPCNC was previously awarded $75,000 per year for the pregnancy prevention program in Cumberland

4

County, and this funding is also now being withheld as a result of Section 10.19.[1]

Shortly after passage of this legislation, Plaintiff filed the present suit, contending that Section 10.19 is unconstitutional for multiple reasons, including violation of the Supremacy Clause, violation of the First Amendment, violation of the Equal Protection Clause, and violation of the prohibition against Bills of Attainder. Plaintiff also filed the present Motion for Preliminary Injunction, contending that PPCNC would suffer irreparable harm unless enforcement of Section 10.19 is enjoined during the pendency of this suit.

II.    MOTION FOR PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy that may be imposed prior to trial in the discretion of the trial court in order to preserve the *status quo* during the pendency of the suit and ensure the court's ultimate ability to grant effective relief at the conclusion of the suit. See In re Microsoft Corp. Antitrust Litigation, 333 F.3d 517, 524-25 (4th Cir. 2003) (noting that preliminary injunctions are "extraordinary remedies" entered in the discretion of the trial court "to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits"). A movant must establish four elements before a preliminary injunction may issue: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor; and (4) and injunction is in the public interest.

---

[1] Indeed, at the hearing on Plaintiff's Motion for a Preliminary Injunction, counsel for Defendant acknowledged that PPCNC had been approved for these grants prior to the passage of Section 10.19 and that the funding was available to Defendant Cansler for distribution. When asked why the funds were not being provided to PPCNC, counsel for Defendant acknowledged that the funds were being withheld because of Section 10.19.

5

<u>Winter v. Natural Resources Defense Council, Inc.</u>, 555 U.S. 7, 24, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008); <u>The Real Truth About Obama, Inc. v. Federal Election Comm'n</u>, 575 F.3d 342 (4th Cir. 2009), <u>vacated and remanded</u>, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (2010), <u>reissued as to Parts I and II</u>, 607 F.3d 355 (4th Cir. 2010). The Court will therefore consider each of these factors in turn in determining whether a preliminary injunction should issue in the present case.

## A.    Likelihood of Success on the Merits

In order to obtain a preliminary injunction, Plaintiff must first make a clear showing that it is likely to ultimately succeed on the merits of the case at trial. <u>Real Truth</u>, 575 F.3d at 345-46. In the present case, Plaintiff brings claims pursuant to 42 U.S.C. §1983 and directly pursuant to the Constitution, contending that Section 10.19 is unconstitutional because (1) with respect to the federal Title X funding, Section 10.19 imposes an additional state criteria in conflict with the provisions of Title X and is therefore invalid under the Supremacy Clause; (2) Section 10.19 violates the First Amendment and the Substantive Due Process Clause; and (3) Section 10.19 violates the Equal Protection Clause and the prohibition on Bills of Attainder. In its Motion for Preliminary Injunction, Plaintiff contends that it is likely to succeed as to each of these contentions, and each of these claims will therefore be considered below.

### 1.    Supremacy Clause

The Supremacy Clause, Article VI, cl. 2 of the United States Constitution, provides that the Constitution and laws of the United States "shall be the supreme Law of the Land" notwithstanding any contrary state law. In this case, Plaintiff contends that Section 10.19 is

6

contrary to and in conflict with the provisions of Title X and is therefore invalid under the Supremacy Clause. As noted above, Title X of the Public Health Service Act is a federal program providing funds for family planning services for low-income or uninsured women and families. Under 42 U.S.C. § 300(a), the federal Department of Health and Human Services provides grants and enters into contracts with "public or nonprofit private entities" to establish and operate family planning projects. The criteria are set out in 42 U.S.C. § 300(b):

> In making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance.

The federal regulations likewise provide that "[a]ny public or nonprofit private entity in a State may apply for a grant under this subpart" and specifically require only that a project must "[p]rovide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including infertility services and services for adolescents)." 42 C.F.R. §§ 59.3, 59.5. Title X funds, however, may not be used to fund abortion services. See 42 U.S.C. § 300a-6; 42 C.F.R. § 59.5(a)(5). But Title X does not contain any provision that would prohibit entities that provide abortions from receiving Title X funds for non-abortion-related services. See Planned Parenthood of Houston and Southeast Texas v. Sanchez, 403 F.3d 324, 340 (5th Cir. 2005) ("Under Title X, then, abortion providers are eligible to receive family planning funding; Title X requires only that they use that funding for legitimate Title X purposes."). Title X funds may be provided directly from the federal Department of Health and Human Services to a service provider, or may be provided to a grantee who contracts with service providers. North Carolina is a Title X grantee, and North

Carolina has previously contracted with service providers, including Plaintiff PPCNC, to provide non-abortion-related family planning services under Title X.

In the present case, Plaintiff contends that Section 10.19 conflicts with and is preempted by Title X because Section 10.19 adds an additional "eligibility criteria" for receiving Title X funding, to the extent that it singles out and excludes Planned Parenthood and its affiliates from receiving Title X funding administered by DHHS. Plaintiff contends that this exclusion is in conflict with Title X, because Title X and its regulations provide that "any public or nonprofit private entity in a State" may apply for funding. See Sanchez, 403 F.3d at 336-37 (noting that "a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause"). In response, Defendant contends that (a) Plaintiff cannot bring this challenge pursuant to either 42 U.S.C. § 1983 or as a direct Supremacy Clause challenge; (b) the Eleventh Amendment bars Plaintiff's claim; and (c) Plaintiff is not likely to succeed because there is no conflict between Section 10.19 and Title X. Each of these contentions by Defendant will be considered in turn as part of the determination of whether Plaintiff is likely to succeed on the Supremacy Clause claim.

(a).     Availability of Claim under 42 U.S.C. § 1983 or directly under the Supremacy Clause

Defendant first contends that Plaintiff may not assert a claim under 42 U.S.C. § 1983 for a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States because Plaintiff does not have a "right" to funding under Title X. Cf. Gonzaga Univ. v. Doe, 536 U.S. 273, 122 S. Ct. 2268, 153 L. Ed. 2d 309 (2002) (concluding that a plaintiff may bring a claim under § 1983 for violation of a federal spending statute only if the

8

underlying statute manifests an intent to create individually enforceable rights); Blessing v. Freestone, 520 U.S. 329, 340, 117 S. Ct. 1353, 1359, 137 L. Ed. 2d 569 (1997) (noting that "[i]n order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law"); Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107, 110 S. Ct. 444, 449, 107 L. Ed. 2d 420 (1989) (noting that "the Supremacy clause, of its own force, does not create rights enforceable under § 1983"). Defendant therefore contends that the Supremacy Clause challenge in the present case may not be asserted pursuant to § 1983. As a corollary, Defendant also contends that Plaintiff may not raise a direct Supremacy Clause challenge with respect to a federal "spending" statute such as Title X, and that if state law conflicts with Title X, the proper enforcement mechanism is for the federal government to withdraw Title X funding from the state. See Gonzaga, 536 U.S. at 280, 122 S. Ct. at 2273 (concluding that no § 1983 damages claim could be brought by individuals against a state for violation of the Federal Educational Rights and Privacy Act, and noting that "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State" (internal quotations omitted)).

In response, Plaintiff does not concede that there is no right enforceable under 42 U.S.C. § 1983, but Plaintiff contends that regardless of whether the Court accepts Defendant's contentions regarding § 1983, Plaintiff can still pursue a preemption claim for declaratory and injunctive relief directly under the Supremacy Clause, within the jurisdiction of the federal courts

9

under 28 U.S.C. § 1331. In this regard, the Supreme Court has noted that "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve." Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96 n.14, 103 S. Ct. 2890, 2899 n.14, 77 L. Ed. 2d 490 (1983); see also Verizon Maryland, Inc. v. Global NAPS, Inc., 377 F.3d 355 (4th Cir. 2004) (finding, on remand from the Supreme Court, that the plaintiff could bring a preemption claim for declaratory and injunctive relief based on federal question jurisdiction under 28 U.S.C. § 1331, even if there was no separate private right of action under the federal statute). Specifically with respect to "funding" or "spending" statutes, the Supreme Court has noted that "[t]here is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." King v. Smith, 392 U.S. 309, 333 n.34, 88 S. Ct. 2128, 2141 n.34, 20 L. Ed. 2d 1118 (1968). In addition, courts have concluded that under existing Supreme Court case law, contrary to Defendant's contentions, the ability of the Federal Government to compel compliance with "spending" statutes by withholding funds from the states does not preclude a preemption claim in federal court under the Supremacy Clause. See, e.g., Sanchez, 403 F.3d at 331-32 and n.34 (noting that "seven Justices assumed both that the federal courts have jurisdiction and that a claim was stated for Spending Clause preemption" and rejecting the contention that the only remedy for failure to

10

comply with a Spending Clause statute was for the federal government to terminate a state's funding); see also Antrican v. Odom, 290 F.3d 178, 188-90 (4th Cir. 2002) (rejecting the contention that federal legislation adopted pursuant to the Spending Clause is not subject to the Supremacy Clause, and concluding that even though Medicaid was adopted pursuant to the Spending Clause, once a state chooses to participate, the federal provisions are binding, and conflicting state laws are subject to invalidation under the Supremacy Clause).

Moreover, specifically with respect to Title X, courts considering claims of Title X preemption have recognized a potential claim for declaratory and injunctive relief either pursuant to § 1983 or directly pursuant to the Supremacy Clause within the court's jurisdiction under 28 U.S.C. § 1331. See Sanchez, 403 F.3d at 331-35 (noting that "[i]t is well established that the federal courts have jurisdiction under 28 U.S.C. § 1331 over a preemption claim seeking injunctive and declaratory relief" and plaintiffs challenging state eligibility criteria for Title X funds "have an implied right of action to seek injunctive relief from a state statute purportedly preempted by federal Spending Clause legislation," even if such claims may not be asserted under § 1983); Planned Parenthood of Billings, Inc. v. Montana, 648 F. Supp. 47, 49-50 (D. Mont. 1986) (recognizing preemption claim raising Supremacy Clause challenge to state statute based on Title X, asserted pursuant to 42 U.S.C. § 1983); see also Planned Parenthood of Indiana v. Comm'r of the Indiana State Dep't of Health, No. 1:11-cv-630, 2011 WL 2532921, at *15-16 (S.D. Ind. June 24, 2011) (recognizing the ability of Planned Parenthood to bring a preemption challenge against a state statute that restricted funding covered by the federal Preventative Health Services Block Grant program, 42 U.S.C. § 247c(c)). Thus, Plaintiff finds

11

support for its position in the cases cited here, but Defendant, on the other hand, has not

pointed to any case authority where a court has refused to consider a similar Title X preemption

challenge.[2]

Having considered this issue, the Court notes that the Supreme Court has granted

certiorari in Maxwell-Jolly v. Independent Living Center of Southern California, Inc., 131 S. Ct.

992, 178 L. Ed. 2d 824 (2011), to resolve the question of whether individuals may assert a direct

cause of action under the Supremacy Clause to enforce federal Spending Clause statutes against

states under a preemption theory. However, as set out above, the present weight of authority

and the current law of the Fourth Circuit would support the conclusion that Plaintiff in the

present case can raise a claim under the Supremacy Clause for declaratory and injunctive relief

based on the contention that a state statute, here Section 10.19, is preempted by Title X, even

if Plaintiff could not assert a claim under 42 U.S.C. § 1983. Thus, even if the Court assumes that

Plaintiff's Supremacy Clause claim could not be asserted under § 1983, as Defendant contends,

the Court nevertheless concludes that Plaintiff has established a clear likelihood of success with

respect to its ability to bring a preemption claim directly pursuant to the Supremacy Clause,

within the jurisdiction of this Court under 28 U.S.C. § 1331.

---

[2] The only Title X case cited by Defendant is a district court decision from the Eastern
District of Pennsylvania, involving a claim by individuals related to injuries suffered as a result
of an emergency contraceptive pill provided by a public health center. See Anspach v. City of
Philadelphia, 630 F. Supp. 2d 488 (E.D. Pa. 2008). The court in Anspach concluded that the
individual plaintiffs could not pursue a § 1983 claim against the public health center based on
alleged violations of Title X, because Title X did not "evince Congressional intent to confer a
right directly on a class of persons that includes the plaintiff in a case such as this one." Id. at
495. However, that case involved an individual § 1983 damages claim, and did not in any way
involve a challenge to state legislation under the Supremacy Clause raising claims that the state
added additional criteria for obtaining Title X funding. See id.

12

(b).    Eleventh Amendment Issues

Defendant next contends that even if Plaintiff were otherwise likely to succeed on the merits, Plaintiff's claims are barred by the Eleventh Amendment. In this regard, the Court notes that the Eleventh Amendment generally bars actions for damages against unconsenting states in federal court. However, under the doctrine first set out in Ex Parte Young, the Eleventh Amendment does not bar an action in federal court to enjoin a state official from ongoing and future violations of federal law. See Ex Parte Young, 209 U.S. 123, 160, 28 S. Ct. 441, 454, 52 L. Ed. 2d 714 (1908); Antrican, 290 F.3d at 184 (noting that the Ex Parte Young exception "allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute"). The Court notes that Plaintiff has made it clear in the present case that it seeks injunctive relief, not damages, and seeks to prevent Defendant Cansler from enforcing state legislation that violates the federal constitution. Such a claim is therefore not barred by the Eleventh Amendment. Cf. Planned Parenthood of Kansas and Mid-Missouri v. Brownback, No. 11-2357, 2011 WL 3250720, at *9 (D. Kan. Aug. 1, 2011) ("The court finds that the injunctive relief sought by Planned Parenthood will not violate the Eleventh Amendment, as it seeks an order which would simply preclude the defendants from any decision allocating Title X funding on the basis of the allegedly unconstitutional" state legislation); Antrican, 290 F.3d at 189 (noting that "in Ex Parte Young itself, the actual defendant was the State Attorney General; yet the effect of the case was to nullify a State statute because the Court ordered the Attorney General not to enforce the statute"); see also Will v. Michigan Dep't of State Police,

13

491 U.S. 58, 71 n.10, 109 S. Ct. 2304, 2312 n.10, 105 L. Ed. 2d 45 (1989) (concluding that a state is not a "person" subject to suit under § 1983, but further noting that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state.'" (citing Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 3106 n.14, 87 L. Ed. 2d 114 (1985); Ex Parte Young, 209 U.S. at 159-60, 28 S. Ct. at 453-54)).

Moreover, the Court notes that Plaintiff has made it clear that it is requesting prospective relief. Specifically, Plaintiff has requested an injunction to prohibit future enforcement of or reliance on Section 10.19. Plaintiff does not seek retroactive injunctive or monetary relief. Cf. Antrican, 290 F.3d at 186 (noting that "the proper focus must be directed at whether the injunctive relief sought is prospective or retroactive in nature"); see also Pinehurst State School & Hospital v. Halderman, 465 U.S. 89, 102-03, 104 S. Ct. 900, 909, 79 L. Ed. 2d 67 (1984) (noting that under Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974), "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief").[3] Therefore, the Court concludes that based on the relief sought

---

[3] The Court notes that the Ex Parte Young exception "permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the treasury." Milliken v. Bradley, 433 U.S. 267, 289, 97 S. Ct. 2749, 2762, 53 L. Ed. 2d 745 (1977). Thus, a prospective injunction can be imposed even if it would affect the state treasury. However, there is no need to consider the impact on the treasury in the present case, in any event, because the parties agree that there is no impact on the state treasury or budget in this case. To the extent that a prospective injunction would affect certain funding programs, the funds at issue are federal funds which have already been designated for the Title X program, and state funds that will still be provided to some public or nonprofit private entity for the Women's Health Grant and Teen Pregnancy Initiative, even if it is not PPCNC. Thus,

14

by Plaintiff in this case, there is nothing about Plaintiff's claims in this case that would be barred by the Eleventh Amendment.

(c). Preemption of Section 10.19 by Title X

Finally, Defendant contends that Plaintiff cannot establish a likelihood of success with respect to the Supremacy Clause claim because Section 10.19 does not conflict with Title X. However, the overwhelming weight of authority supports the conclusion that Section 10.19 would be preempted by Title X. In this regard, the Court notes that the U.S. District Court for the District of Kansas recently considered a similar Supremacy Clause challenge. See Planned Parenthood of Kansas, 2011 WL 3250720, at *9-12. The Kansas legislation at issue in that case prioritized public health departments and hospitals over Planned Parenthood for receipt of Title X funding. The Kansas District Court granted a preliminary injunction, noting that "[b]y participating in Title X, the state is obliged to forgo seeking to implement policies contrary to Title X." Id. at *9 (citing Planned Parenthood Ass'n of Utah v. Dandoy, 810 F.2d 984 (10th Cir.1987)). In reaching this conclusion, the Kansas court relied on multiple decisions, including a Fifth Circuit decision concluding that "a state eligibility standard that altogether excludes entities that might otherwise be eligible for federal funds is invalid under the Supremacy Clause." Sanchez, 403 F.3d at 336–37. The Kansas court concluded that "a state law which added eligibility requirements which would effectively exclude abortion providers from participating in Title X 'would seriously undermine and obstruct Congress's intent.'" Planned Parenthood of Kansas, 2011 WL 3250720, at *9 (quoting Sanchez, 403 F.3d at 341); see also Planned

---

the parties agree that the requested relief would not impact or alter the state budget to any degree.

15

Parenthood Fed. of Am. v. Heckler, 712 F.2d 650, 663-64 (D.C. Cir.1983) ("Title X does not provide, or suggest, that states are permitted to determine eligibility criteria for participants in Title X programs" and "[i]t is elementary that under the Supremacy Clause of the Constitution states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing federal statutory or regulatory scheme"); Hern v. Beye, 57 F.3d 906, 913 (10th Cir.1995) (reaching similar conclusion as to Title XIX funding).

In sum, Plaintiff offers supporting authority based upon two circuit court cases and three district court cases that are almost directly on point. Each of these cases would support the conclusion that a state statute excluding Planned Parenthood from eligibility for Title X funding administered by the state would be in conflict with Title X and therefore preempted under the Supremacy Clause. See Sanchez, 403 F.3d at 337-42 (holding that a state statute that prohibited distribution of family planning funds to entities that perform abortions would be inconsistent with Title X and in violation of the Supremacy Clause to the extent that the state statute excluded otherwise eligible entities from receiving funding for family planning programs, but the state statute would be constitutional if the state statute were construed to authorize entities to receive family planning funding if the entities created "affiliates" that provided the abortion services, in order to keep the family planning programs separated from the abortion services); Valley Family Planning v. North Dakota, 661 F.2d 99, 100 (8th Cir. 1981) (holding that a state statute withholding Title X funds from any entity that performs, refers or encourages abortions was in conflict with Title X and was therefore invalid under the Supremacy Clause); Planned Parenthood of Kansas, 2011 WL 3250720, at *9 (holding that a state statute that operated to

16

exclude Planned Parenthood from receiving federal Title X funding administered by the state was invalid under the Supremacy Clause); <u>Planned Parenthood of Indiana</u>, 2011 WL 2532921, at *15-16 (concluding that a state statute prohibiting Indiana from providing any federal funds administered by the state to any entity that performs abortions or any entity that operates a facility where abortions are performed is preempted by federal law analogous to Title X); <u>Planned Parenthood of Billings, Inc.</u>, 648 F. Supp. at 51 (striking down a state law which added a requirement that for any Title X funds distributed by the state, any abortions must occur in a physically separate facility from the family planning services funded by Title X).

In contrast, Defendant has not pointed to any cases in which a provision similar to Section 10.19 was upheld as being constitutional.[4] The Court notes that at the hearing, Defendant argued that there was no conflict with Title X because Plaintiff was free to apply directly to the federal government for Title X funds, without going through the state. However, Plaintiff has established that the process for applying for and obtaining funding for the present fiscal year has already passed. As noted above, for the 2011-2012 fiscal year, Plaintiff applied for Title X funding through DHHS and was successful in that process and was awarded funds through the state's Title X grant. It is those funds that are now being withheld pursuant to Section 10.19, and Plaintiff would not now have the opportunity to obtain Title X funds directly

---

[4] Moreover, although the Fifth circuit in <u>Sanchez</u> concluded that the statutes at issue in that case could be rendered constitutional if the statute was interpreted to allow the creation of affiliates to perform the abortion services, in the present case Defendant has not argued that Section 10.19 can be construed in that manner. Indeed, Section 10.19 by its very language prohibits funding for Planned Parenthood *and its affiliated organizations*. Thus, Section 10.19 directly forecloses the one distinguishing basis that <u>Sanchez</u> suggested for construing a provision such as Section 10.19 to render it constitutional.

17

from the federal government for the present fiscal year. Moreover, even if Plaintiff could apply directly to the federal government in future years, the state still would not be free to add additional criteria for Title X funding administered by the state. See Planned Parenthood of Kansas, 2011 WL 3250720, at *12 (concluding that "[i]t is irrelevant that Planned Parenthood might—after considerable delay and damage—obtain a direct grant of funding from HHS in some future year" because the Title X eligibility standards apply not just to direct grantees, but also to sub-grantees of a state). Therefore, the Court concludes that the fact that Plaintiff may, at some point in the future, be able to apply directly for Title X funding does not mean that the state may now or in the future impose additional eligibility criteria or exclusions with respect to the Title X funding administered by the state. As such, the Court finds that Plaintiff has made a clear showing that it is likely to succeed on its claim that Section 10.19 violates the Supremacy Clause, to the extent that Section 10.19 limits the distribution of federal Title X funds administered by DHHS.

　　　2.　　First Amendment and Due Process

Having concluded that Plaintiff has established a likelihood of success with respect to its Supremacy Clause preemption claim, the Court will now turn to a consideration of Plaintiff's likelihood of success with respect to its alternative contention that Section 10.19 is unconstitutional under the First Amendment and the Due Process Clause of the Fourteenth Amendment. In making this determination, the Court notes that in Rust v. Sullivan, the Supreme Court considered a First Amendment challenge to federal regulations that required separation between abortion activities and federally-funded family planning services. See Rust

18

v. Sullivan, 500 U.S. 173, 111 S. Ct. 1759, 114 L. Ed. 2d 233 (1991). In Rust, the Supreme Court noted the important distinction between federally-funded *projects* and federal project *grantees*. The Court held that Congress could appropriately limit the scope of a federally-funded *project*, so as to exclude funding projects involving abortion services, while still leaving the grantee "unfettered" in its other non-abortion-related activities. Thus, there was no First Amendment violation in that case because it was determined that the "grantee can continue to perform abortions, provide abortion-related services, and engage in abortion advocacy" and the grantee was simply "required to conduct those activities through programs that are separate and independent from the project that receives [federal] funds." Rust, 500 U.S. at 196, 111 S. Ct. at 1774.

In Rust, the Supreme Court further noted that "[i]n contrast, our 'unconstitutional conditions' cases involve situations in which the Government has placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." Id. at 196-97, 111 S. Ct. at 1774. In those "unconstitutional condition" cases, the Supreme Court has made it clear that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely" in denying a benefit. Perry v. Sindermann, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697, 33 L. Ed. 2d 570 (1972). Specifically, "[i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech. For if the

19

government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.'" Id. (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S. Ct. 1332, 1342, 2 L. Ed. 2d 1460 (1958)); see also O'Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 116 S. Ct. 2353, 135 L. Ed. 2d 874 (1996) (holding that a governmental entity's refusal to contract with a service provider on the basis of the service provider's political activities or advocacy violates the First Amendment); Harris v. McRae, 448 U.S. 297, 317 n.19, 100 S. Ct. 2671, 2688 n.19, 65 L. Ed. 2d 784 (1980) (upholding denial of funding for a particular service, but distinguishing any attempt to deny funding for a particular recipient, and noting that "[a] substantial constitutional question would arise if Congress had attempted to withhold all Medicaid benefits from an otherwise eligible candidate" based on her constitutionally protected activity).

In the present case, Plaintiff contends that Section 10.19 does not simply limit funding for particular *projects*; instead it limits funding for a certain group of *grantees*, that is, Planned Parenthood and its affiliates. With respect to this contention, there is no dispute that Section 10.19 prohibits Planned Parenthood and its affiliated organizations, including PPCNC, from receiving funding even for non-abortion-related projects based on their other activities for which they have not sought funding. There is also no suggestion that PPCNC would use any of the funding for abortion services, and Defendant concedes that there is no allegation of any past or present misuse of funds by PPCNC. Thus, Section 10.19 denies PPCNC funding as a grantee, and does not just limit funding for particular projects.

20

In considering whether Section 10.19 is unconstitutional under the standard articulated in Rust, the Court notes that other courts that have considered similar state legislation have concluded that such legislation imposes an "unconstitutional condition" in violation of the First and Fourteenth Amendments. See Planned Parenthood of Kansas, 2011 WL 3250720, at \*13 (finding that a similar statute was "unconstitutional as an attempt to punish the plaintiff for its support for abortion rights and its association with abortion services providers"); see also Planned Parenthood of Mid-Missouri and Eastern Kansas v. Dempsey, 167 F.3d 458, 463-64 (8th Cir. 1999) (holding that a state statute excluding abortion providers from receiving state family planning funds would be an unconstitutional penalty under Rust, unless construed to allow grantees to create independent affiliates that could perform abortions); Planned Parenthood of Central and Northern Arizona v. Arizona, 718 F.2d 938, 945 (9th Cir. 1983) (holding that a state statute could "forbid entities receiving state funds from using those funds for abortions and the related activities," but rejecting the contention that a state could refuse to fund otherwise eligible activities "merely because they engage in abortion-related activities disfavored by the state," and remanding for a determination of whether withdrawal of all state funds was the only way to ensure that state funds were not used for abortion-related activities); Planned Parenthood of Kansas, Inc. v. City of Wichita, 729 F. Supp. 1282, 1287-88 (D. Kan. 1990) (holding that a local government decision not to provide funding for family planning programs to Planned Parenthood was unconstitutional "viewpoint based discrimination" that singled out Planned Parenthood "on the basis of its advocacy of certain unpopular ideals" in violation of the First Amendment). Pursuant to this available case law, while a state may

21

completely choose not to fund abortion services, the state may not bar an entity from the benefit of funding for which it would otherwise be eligible based on the entity's participation in unrelated "legal and constitutionally-protected conduct." Planned Parenthood of Kansas, 2011 WL 3250720, at *15.

Plaintiff relies on this available case law in support of its position that Section 10.19 is unconstitutional in violation of the First and Fourteenth Amendments. In response, Defendant again has not pointed to any case law which would uphold a state or federal provision that would exclude a *grantee* from receiving funding, as has occurred with Section 10.19. Instead, Defendant has cited only to cases authorizing limitations on the funding of particular *projects*. See, e.g., Regan v. Taxation with Representation of Washington, 461 U.S. 540, 103 S. Ct. 1997, 76 L. Ed. 2d 129 (1983); Harris v. McRae, 448 U.S. 297, 100 S. Ct. 2671, 65 L. Ed. 2d 784 (1980); Maher v. Roe, 432 U.S. 464, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977). However, as the Court has noted, while the state is indeed free to limit funding for particular projects, including limiting funding for abortion services, that does not leave the state free to restrict a particular grantee from receiving any funding for other, eligible projects. See Planned Parenthood of Kansas v. Wichita, 729 F. Supp. at 1289 ("It is correct that the government has no positive obligation to fund or subsidize certain activities, including abortion. However, while the government need not subsidize a woman's right to abortion, it may not create 'a penalty for the exercise of constitutional rights.'" (internal citations omitted)). Thus, the existing case law would support the conclusion that Section 10.19 is an unconstitutional provision in violation of the First and Fourteenth Amendments. As such, the Court concludes that Plaintiff has demonstrated a

22

likelihood of success on their claim that Section 10.19 violates the First Amendment under established precedent.

      3.     Equal Protection and Bill of Attainder

Having concluded that Plaintiff has demonstrated a likelihood of success with respect to the Supremacy Clause preemption claim and the First and Fourteenth Amendment claim, the Court notes that Plaintiff also contends that Section 10.19 violates the Equal Protection Clause and violates the Constitutional prohibition against Bills of Attainder. As to both of these claims, Plaintiff essentially contends that Planned Parenthood, Inc. and its affiliates were unconstitutionally singled out for punishment by Section 10.19 without a rational or nonpunitive basis.

"A legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding." Lynn v. West, 134 F.3d 582, 594 n.11 (4th Cir. 1998); see also U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder."). The Supreme Court has held that "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply - trial by legislature." United States v. Brown, 381 U.S. 437, 442, 85 S. Ct. 1707, 1711-12, 14 L. Ed. 2d 484 (1965). Thus, legislative bodies must accomplish their objectives by "rules of general applicability" and "cannot specify the people upon whom the sanction it prescribes is to be levied." Id. at 461, 85 S. Ct. at 1722; see also Communist Party of the United States v. Subversive Activities Control Bd., 367 U.S. 1, 86, 81 S. Ct. 1357, 1405,

23

6 L. Ed. 2d 625 (1961) ("The singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons."). "To constitute a bill of attainder, the statute must (1) specify affected persons, (2) impose punishment, and (3) fail to provide for a judicial trial." Dempsey, 167 F.3d at 465. "To rise to the level of 'punishment' under the Bill of Attainder Clause, harm must fall within the traditional meaning of legislative punishment, fail to further a nonpunitive purpose, or be based on a congressional intent to punish." Id. (citing Selective Serv. Sys. v. Minn. Pub. Interest Research Grp., 468 U.S. 841, 852, 104 S. Ct. 3348, 3355, 82 L. Ed. 2d 632 (1984) and Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 473-76, 97 S. Ct. 2777, 2805-07, 53 L. Ed. 2d 867 (1977)).

In Dempsey, the Court of Appeals for the Eighth Circuit considered a state statute providing that organizations that "provide or promote abortions" would not be eligible for family planning funds. Dempsey, 167 F.3d at 465. The Eighth Circuit held that "the denial of a noncontractual government benefit will not be deemed punishment if the statute 'leaves open perpetually the possibility of qualifying for aid.'" Id. The Eighth Circuit construed the statute in Dempsey to allow Planned Parenthood to qualify for family planning funds by establishing an independent affiliate to perform abortion services. However, in the present case, Section 10.19 does not allow Planned Parenthood to qualify for family planning funds by establishing an independent affiliate to perform its abortion services. Instead, as noted above, Section 10.19 explicitly excludes Planned Parenthood, Inc. *and its affiliated organizations* from any funding administered by DHHS. Therefore, the singling out of Planned Parenthood and its affiliates for

24

the denial of funding would likely be deemed punishment. Cf. Florida Youth Conservation Corps., Inc. v. Stutler, No. 4:06CV275, 2006 WL 1835967, at *2 (N.D. Fla. June 30, 2006) (imposing preliminary injunction where "plaintiff has in effect been found guilty of an unspecified charge and, as its sentence, has been barred from state contracting of the type at issue" and noting that "this is legislative action very much akin to the enactments that prompted the framers to include in the Constitution a prohibition on bills of attainder").

Moreover, the legislative history supports the conclusion that Section 10.19 was intended as punishment. Specifically, during legislative debate, Representative Paul Stam, the Majority Leader in the North Carolina House of Representatives, spoke in support of Section 10.19, asserting that Section 10.19 was appropriate because Planned Parenthood had "particularly unsavory origins in the eugenics movement which was so deleterious in North Carolina" and because of "the connection of Margaret Sanger, the founder of Planned Parenthood, with the eugenics movement." (Pl. Reply Ex. G at 5-6 [Doc. #29-4].) Representative Stam later elaborated on the floor of the House of Representatives, contending that Section 10.19 was appropriate because "Planned Parenthood in general, and Margaret Sanger in particular, its founders, were the driving force behind that [eugenics] effort" and "we should not be rewarding the perpetrators of that program." (Pl. Reply Ex. J at 4-5 [Doc. #29-6].) Senator Warren Daniel also spoke in support of Section 10.19 in the North Carolina Senate, stating that "I just point out to this body that 97 percent of the pregnant women that go to a Planned Parenthood clinic are sold an abortion. Recent year's statistics show 332,227 abortions were performed by Planned Parenthood. Only 977 adoption referrals. I think that's an appalling statistic, and I'm

25

not interested in the constituents in my district funding an organization with these kind of numbers." (Pl. Reply Ex. H at 4 [Doc. #29-5].) Plaintiff notes that none of these statements is accurate, and that the legislative history supports the conclusion that the passage of Section 10.19 was motivated by an intent to punish Planned Parenthood for an alleged historical connection to the eugenics movement and to punish Planned Parenthood for the alleged number of abortions that it had performed, unrelated to any state-funded programs. Plaintiff also notes that legislators opposed to Section 10.19 raised concerns that singling out Planned Parenthood in this manner could constitute an unconstitutional Bill of Attainder, but their concerns were disregarded. (Pl. Reply Ex. G at 8-9 [Doc. #29-4] and Ex. J at 6-8 [Doc. #29-6].)

The Court notes that Defendant now contends that Section 10.19 was not punitive and has a legitimate purpose because it was designed to further the policy of funding "childbirth over abortions." However, Defendant does not contend that PPCNC has improperly used any state funds for abortions, or that a total contracting ban against Planned Parenthood and its affiliates is needed to ensure that funds administered by DHHS are not used for abortion. Instead, based on the evidence before the Court, it appears that Section 10.19 was adopted specifically to penalize Planned Parenthood for its separate abortion-related activities. Therefore, at this preliminary stage, the Court concludes that Plaintiff has presented evidence to establish a likelihood of success with respect to its claim that Section 10.19 singled Planned Parenthood and it affiliates out by name, imposed punishment by barring them from receiving funds administered by DHHS for which they were otherwise eligible, and was intended to punish them for past alleged conduct without a trial. Therefore, the Court concludes that Plaintiff has

26

established a likelihood of success as to its contention that Section 10.19 is an unconstitutional Bill of Attainder.

Plaintiff raises a similar Equal Protection argument, contending that Section 10.19 violates the Equal Protection Clause of the Fourteenth Amendment by singling them out for treatment on an "unequal" basis. See U.S. Const. amend XIV (providing that no State shall "deny to any person within its jurisdiction the equal protection of the laws"). Given that this Court has already determined that Plaintiff has established a likelihood of success on multiple bases, the Court need not reach in great detail Plaintiff's alternative contention that Section 10.19 violates the Equal Protection Clause. The Court notes briefly, however, that pursuant to the Equal Protection Clause, at a minimum, the provisions of Section 10.19 excluding Planned Parenthood and its affiliates from receiving any funding administered by DHHS for which they would otherwise be eligible must be rationally related to a legitimate government purpose. See Romer v. Evans, 517 U.S. 620, 632-33, 116 S. Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996) (holding that "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained" because "[b]y requiring that the classification bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law").

Defendant contends that the legitimate legislative purpose of Section 10.19 is the General Assembly's policy of "favoring childbirth over abortions." Cf. Maher, 432 U.S. at 478, 97 S. Ct. at 2385 (noting that in choosing to fund childbirth services but not abortion services, the state

27

was furthering its "legitimate interest in encouraging normal childbirth"). As noted above, the state interest in favoring childbirth over abortion would indeed provide a basis for prohibiting state funds from being used for abortion services, and there is no dispute that North Carolina has already prohibited state funding of abortions. However, Defendant has not presented any grounds to conclude that the state interest in favoring childbirth over abortions would provide a basis for the complete contracting ban contained in Section 10.19, which prohibits PPCNC from receiving funding for non-abortion-related services for which PPCNC would otherwise be eligible. In this regard, the Court notes that there is no evidence or contention that such a complete ban is necessary to prevent state funds from being used to fund abortion services, since Defendant concedes that there is no evidence or even allegation that PPCNC has improperly used any state or federal funding for abortion services. Thus, Defendant has not presented any evidence or even contention to establish how Section 10.19's ban on using PPCNC for non-abortion-related projects is rationally related to a legislative policy of funding childbirth services over abortion services. See Planned Parenthood of Kansas v. Wichita, 729 F. Supp. at 1290-91 (concluding that legislation precluding the City from contracting with Planned Parenthood violated the Equal Protection Clause because "[t]he resolution was adopted in retaliation for the plaintiffs' pursuit of constitutionally-protected activities, and the record is devoid of a legitimate rationale which would justify the distinction between Planned Parenthood and other family planning organizations"); Planned Parenthood of Minnesota v. Minnesota, 612 F.2d 359, 360-61 (8th Cir. 1980) (concluding that legislation prohibiting family planning grants to "any nonprofit corporation which performs abortions" violated the Equal Protection Clause

28

where there was no evidence that Planned Parenthood improperly used federal or state funding for abortion services and there was "no rational distinction between [Planned Parenthood] and any other non-profit corporation with respect to the providing of pre-pregnancy family planning services"). Moreover, as noted above, the legislative history provides further evidence that Section 10.19 was passed for the purpose of penalizing Planned Parenthood and its affiliates. See Romer, 517 U.S. at 634, 116 S. Ct. at 1628 ("'[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.'" (quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S. Ct. 2821, 2826, 37 L. Ed. 2d 782 (1973)). Therefore, based on the information presented, the Court concludes that Plaintiff would also be able to show a likelihood of success on it claim that Section 10.19 violates the Equal Protection Clause. Thus, the Court concludes that Plaintiff has established a likelihood of success with respect to its contentions that Section 10.19 is unconstitutional under the Equal Protection Clause and as a violation of the prohibition against Bills of Attainder, which Plaintiff raised as alternatives to the Supremacy Clause and First Amendment claims discussed above.

**B.     Likelihood of Irreparable Harm**

Having concluded that Plaintiff has established a clear likelihood of success on multiple bases, the Court must now consider the remaining factors to determine whether a preliminary injunction should issue in this case. With respect to the likelihood of irreparable harm, the Supreme Court has held that "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." Winter, 555 U.S. at 22, 129 S. Ct. at

375; see also Real Truth, 575 F.3d at 347 ("Winter requires that the plaintiff make a clear showing that it is likely to be irreparably harmed absent preliminary relief."). In the present case, Plaintiff has effectively argued and shown that they would be forced to close facilities, lay-off employees and cease providing certain women's health services (not related to abortion services) if a preliminary injunction is not granted. Specifically, based on the evidence presented, the Court finds that Plaintiff has already stopped providing free long-lasting contraceptives to low-income women as a result of the passage of Section 10.19. These services would have been funded through the Women's Health Grant. There is no dispute that this funding is still available to Defendant Cansler. However, Defendant Cansler is not providing the funding to Plaintiff, based solely on the passage of Section 10.19. In addition, the Court finds that Plaintiff has also established that due to the passage of Section 10.19, it will be forced to lay off staff members who would have been responsible for the Teen Pregnancy Prevention Program in Cumberland County. Again, the Court notes that this funding as well is still available to Defendant Cansler, but is not being provided to Plaintiff solely because of Section 10.19.[5] Finally, the Court finds that Plaintiff has established that due to Section 10.19, PPCNC will be

---

[5] The Court notes that as a general matter, the state is not required to provide funding for particular programs. Thus, the state could choose, for instance, to eliminate funding for all teen pregnancy prevention programs. In that case, Plaintiff would be harmed like any other entity that had been approved and promised funding for these programs and was faced with laying off employees as a result of the lack of funding. However, the harm in that instance would be the result of a funding cut, applicable to all entities that provide teen pregnancy prevention programs. In the present case, Section 10.19 prohibits Defendant Cansler from providing Plaintiff with any funding, even funding for programs that have already been approved and for which funding is available. The Court has therefore considered the potential irreparable harm to Plaintiff as a result of the enforcement of Section 10.19, particularly in that it has caused Plaintiff not to receive funding that has already been approved and is presently available for distribution.

30

unable to operate the Latino Family Planning program and will likely be forced to close the Durham Clinic within the next few weeks. The funding for the Latino Family Planning program is Title X federal funding for which PPCNC has already been approved and which is available to Defendant Cansler, but the funding is being withheld from Plaintiff pursuant to Section 10.19. Plaintiff has established that if the clinic is closed, it would be extremely difficult, if not impossible, to reopen and re-establish client relationships at some point in the future. Based on all of the evidence presented, the Court finds that the potential harm established by Plaintiff is "likely" and not simply "possible" harm. The Court further finds that the harm is irreparable in that if the staff members are laid off and the clinic is closed, the Court would be unable to provide an effective or meaningful remedy at the conclusion of this litigation. Cf. Planned Parenthood of Indiana, 2011 WL 2532921, at *17 (finding irreparable harm in a challenge to similar legislation in Indiana, where Planned Parenthood had ceased performing services covered by the federal grant and would be forced to close health centers and eliminate positions as a result of the legislation); Planned Parenthood of Kansas, 2011 WL 3250720, at *16 (finding irreparable harm to Planned Parenthood from the loss of Title X funding as a result of similar legislation, where the lack of funding would require Planned Parenthood to lay off employees and close health centers). The Court therefore concludes that Plaintiff has established a likelihood of irreparable harm if the preliminary injunction is not granted.[6]

---

[6] Defendant nevertheless contends that no preliminary injunction is required to preserve the "status quo" in this case because the "status quo" is the status between the parties following passage of Section 10.19. However, for purposes of preliminary injunctive relief, the status quo is the "last peaceable uncontested status existing between the parties before the dispute developed." 11A Charles Alan Wright, Federal Practice and Procedure § 2948; see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149, 1155 (10th Cir. 2001)

## C.    Balance of Equities

In considering whether to impose a preliminary injunction, the Court must also "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter, 555 U.S. at 24, 129 S. Ct. at 376 (internal quotation omitted).  In the present case, the harm to Plaintiff, discussed above, involves the potential closing of facilities and laying off of staff as a result of Section 10.19.  Plaintiff contends that it would be inequitable to allow Defendant Cansler to enforce an unconstitutional statute in order to force Planned Parenthood facilities to close.  This potential harm must therefore be balanced against any potential harm to Defendant Cansler in determining whether to grant the requested preliminary relief.

With respect to the potential harm to Defendant, Defendant Cansler contends that the balance of equities tips in his favor because DHHS should not be forced to enter into any particular funding contract with a service provider.  In this regard, Defendant Cansler notes that review of a preliminary injunction "is even more searching when the preliminary injunctive relief ordered by the district court is mandatory rather than prohibitory in nature" because "[m]andatory preliminary injunctions generally do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief." In re Microsoft, 333 F.3d at 525-26 (internal quotation omitted).  However, the

---

(noting that "the status quo is the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing" based on "the reality of the existing status and relationship between the parties and not solely [] the parties' legal rights" (internal quotations omitted)).  In this case, the relevant status quo is the parties' status prior to passage of Section 10.19.  Therefore, the Court concludes that a preliminary injunction is necessary in order to maintain the status quo as it existed prior to the passage of Section 10.19.

32

injunction requested by Plaintiff is not mandatory in nature and does not involve ordering

DHHS to provide any particular funding. Instead, the preliminary injunctive relief requested

by Plaintiff is simply prohibitory, that is, prohibiting the enforcement of or reliance on Section

10.19 during the pendency of this suit. Thus, a granting of an injunction by the Court would not

impose any undue burden on Defendant, since the injunction would not create any funding

burden or otherwise impose any burden on the state. Defendant Cansler would simply be

prohibited from enforcing potentially unconstitutional criteria during the pendency of this suit.

Cf. Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) ("[A] state is in no way

harmed by issuance of a preliminary injunction which prevents the state from enforcing

restrictions likely to be found unconstitutional." (internal quotation omitted)); Planned

Parenthood of Kansas, 2011 WL 3250720, at *7 (concluding that "the injunctive relief sought

by Planned Parenthood is primarily negative in character, seeking to require the defendants to

prospectively act with respect to Title X funding without reference to or reliance on the allegedly

unconstitutional standards" in the state legislation). Therefore, the Court concludes that Plaintiff

has established that the balance of equities tips in its favor.

### D.    Public Interest

Finally, "[i]n exercising their sound discretion, courts of equity should pay particular

regard for the public consequences in employing the extraordinary remedy of injunction."

Winter, 555 U.S. at 24, 129 S. Ct. at 376-77 (internal quotation omitted). With respect to the

public interest in the present case, the Court notes that Plaintiff is providing women's health and

teen pregnancy prevention services already funded by the state and federal government, separate

from any abortion services. If Section 10.19 is enforced, Plaintiff would have to cease providing those non-abortion-related health services. Such action would result in the public having less access to health services, including family planning services, particularly for low-income women. Plaintiff has effectively shown that no other public health departments or other agencies in the affected area would be able to meet this need in the interim as effectively as PPCNC. Specifically, the evidence indicates that if Plaintiff is forced to lay off staff members and close the Durham clinic as a result of Section 10.19, low-income women would be forced to wait weeks or months to obtain needed health services and family planning services. Cf. Planned Parenthood of Kansas, 2011 WL 3250720, at *16-17 (finding that "the public interest is advanced by the use of Title X funding consistent with the intent of Congress, and free from punitive, view-point based or associational discrimination" and "[t]he public interest is advanced by allowing family planning services to be provided in a manner consistent with uniform local history, avoiding disruptions in the provision of such services"). At the hearing before this Court, counsel for Defendant agreed that it may be more difficult for individuals to obtain health services if the Durham clinic is closed. Therefore, the Court concludes that the public interest is better served by enjoining enforcement of Section 10.19 and thus allowing Plaintiff to continue providing already-funded, non-abortion health services during the pendency of this suit.

III.    CONCLUSION

Based on these determinations, the Court concludes that Plaintiff's Motion for Preliminary Injunction should be granted. Defendant therefore will be enjoined from any

34

further enforcement of or reliance on Section 10.19 of North Carolina Session Law 2011-145 during the pendency of this suit.[7] As a result, Defendant Cansler may not enforce Section 10.19 by singling out Planned Parenthood, Inc. and its affiliated organizations for exclusion from programs funded by the state or funded by the federal government and administered by DHHS for non-abortion related services. Given the lack of any monetary injury to Defendant, no bond will be required.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Preliminary Injunction [Doc. #3] is GRANTED and Defendant is hereby ENJOINED from any further enforcement of or reliance on Section 10.19 of North Carolina Session Law 2011-145 during the pendency of this suit.

This, the 19 day of August, 2011.

United States District Judge

---

[7] The Court notes that, as discussed previously, prior to enactment of Section 10.19 Plaintiff had been notified by Defendant Cansler that PPCNC had been awarded the funding, and Plaintiff had been presented with a contract for 2011-12 for the Title X funding and the Teen Pregnancy Prevention Program. At the preliminary injunction hearing, counsel for Defendant Cansler noted that the reason that the contracts had not been finalized and the funding had not been provided was because of Section 10.19. Having now enjoined enforcement of Section 10.19, the Court expects Defendant Cansler to follow all applicable state and federal laws and regulations, without relying on the prohibition in Section 10.19. If Defendant Cansler takes action that is still a result of reliance on or enforcement of Section 10.19, either explicitly or implicitly, further proceedings would be appropriate to determine Defendant Cansler's compliance with the Court's Order.

35