IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

PLANNED PARENTHOOD OF   )
CENTRAL NORTH CAROLINA,   )
                                )
           Plaintiff,   )
                                )
         v.           )        1:11CV531
                                )
LANIER CANSLER, in his official   )
capacity as the Secretary of the   )
North Carolina Department of   )
Health and Human Services,   )
                                )
         Defendant.   )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on a Motion for Summary Judgment and Permanent Injunction [Doc. #42] filed by Plaintiff Planned Parenthood of Central North Carolina ("Plaintiff" or "PPCNC"), and a Motion for Summary Judgment [Doc. #46] filed by Defendant Lanier Cansler ("Defendant"), in his official capacity as the Secretary of the North Carolina Department of Health and Human Services. The parties' Motions follow this Court's August 19, 2011, Order granting Plaintiff's Motion for a Preliminary Injunction ("Preliminary Injunction Order"), wherein the Court enjoined Defendant from further enforcement of or reliance on Section 10.19 of North Carolina Session Law 2011-145 during the pendency of this suit. Section 10.19, discussed in more detail below, prohibits the North Carolina Department of Health and Human Services ("DHHS") from providing state or federal funds to Planned Parenthood, Inc. and its affiliated organizations, including PPCNC. As noted in the Preliminary Injunction Order, the Court reiterates at the outset that this case does not in any way involve funding for abortion services, but rather involves state legislation that resulted in PPCNC being expressly excluded

from receiving otherwise available funding for contraceptive and teen pregnancy prevention programs, as discussed in more detail below. For the reasons set forth herein, Plaintiff's Motion for Summary Judgment and Permanent Injunction will be granted, Defendant's Motion for Summary Judgment will be denied, and Defendant will be permanently enjoined from any further enforcement of or reliance on Section 10.19 of North Carolina Session Law 2011-145.[1]

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

---

[1] The Court notes that Plaintiff has also filed a Motion for Leave to File an Amended Complaint for Injunctive and Declaratory Relief [Doc. #41]. In its Motion, Plaintiff seeks to amend its Complaint to incorporate certain events that have occurred since filing the original Complaint, namely, that the Court entered the Preliminary Injunction Order in this case, and that Defendant thereafter tendered new family planning services contracts to Plaintiff. In addition, Plaintiff seeks to amend its Complaint to clarify Claim I ("Supremacy Clause") by expressly adding reference to Plaintiff's intent to pursue that claim both directly under the Supremacy Clause and pursuant to 42 U.S.C. § 1983. In moving to amend the Complaint, Plaintiff does not, however, seek to "raise any new claims, request any new relief, or advance any new theories." (Pl.'s Mot. at 1, [Doc. #41]). Defendant opposes Plaintiff's Motion, contending that the Motion is untimely and unnecessary given that "[t]here are no facts or laws different now than they were at the time of the filing of the original Complaint." (Def.'s Resp. at 2, [Doc. #49]). In considering Plaintiff's Motion, the Court notes that, with regard to incorporation of the events that have transpired since filing the original Complaint, both the Court and Defendant are fully aware of the contents of the Preliminary Injunction Order and the circumstances under which that Order was entered by this Court. Furthermore, with regard to Defendant's actions following entry of the Preliminary Injunction Order, the Court notes that Plaintiff has submitted evidence in that regard as part of its Motion for Summary Judgment and Permanent Injunction, and need not amend its Complaint to include such additional facts at this time. Finally, with regard to amending Claim I, the Court, in the Preliminary Injunction Order, addressed the implications of Plaintiff's Supremacy Clause claim both as a claim brought pursuant to 42 U.S.C. § 1983 and as a claim brought directly under the Supremacy Clause. As such, Defendant is on notice of the bases for Plaintiff's Supremacy Clause claim at this time, and further clarification of that matter is unnecessary to resolve the present Motions, as described herein. As such, the Court will deny Plaintiff's Motion for Leave to File an Amended Complaint for Injunctive and Declaratory Relief [Doc. #41].

[2] The facts in this section were previously set forth in the Preliminary Injunction Order. Per their Joint Rule 26(f) Report, the parties agreed that discovery would be unnecessary, "as the claims and defenses in this case are subject to resolution as a matter of law." (Rule 26(f) Report

2

PPCNC operates three health clinics in North Carolina, located in Durham, Chapel Hill, and Fayetteville. PPCNC provides abortion services at certain of its facilities, but also provides non-abortion-related family planning health services as well. These non-abortion-related services, which are provided at each of the clinics, include cancer screenings (pap smears and breast exams); tests for diabetes, anemia, and high cholesterol; testing and treatment for sexually-transmitted infections; colposcopies; and contraceptives. Since 2001, PPCNC has received grants and contracts, administered through DHHS, for certain of these non-abortion-related health services. Specifically, this funding includes Title X funding, which is federal funding under 42 U.S.C. § 300 for family planning services for low-income women. The Title X funding provides $125,000 annually for PPCNC's Latino Family Planning Outreach Project at the Durham clinic, a project designed to provide family planning services, contraception, and similar health services to low-income, uninsured Latino clients. PPCNC has also received $75,000 annually in funds under the Teen Pregnancy Prevention Initiative, which includes federal block-grant funds as well as state funds earmarked for the State's Adolescent Pregnancy Prevention Project. This funding supports PPCNC's adolescent pregnancy prevention program for residents of Cumberland County. Finally, PPCNC also receives $12,000 annually under a state-funded Women's Health Service Fund Grant, which funds PPCNC's program to provide long-acting contraceptives to low-income women in Durham County,

---

at 1, [Doc. #36]). As a result, the facts underlying the present Motions are the same as the facts relied upon by the Court in issuing the Preliminary Injunction Order, with the exception that, following entry of the Preliminary Injunction Order, Defendant executed family planning services contracts with Plaintiff, as described below.

Orange County, and Cumberland County who are not eligible for Medicaid.

In the present suit, PPCNC generally contends that as a result of recent state legislation, PPCNC has been unconstitutionally excluded from receiving state and federal funds for non-abortion-related programs. The contested statutory provision is included in North Carolina Session Law 2011-145, enacted into law on June 15, 2011, over the veto of North Carolina Governor Beverly Perdue. The Session Law itself is an appropriations law for fiscal years 2011-2012 and 2012-2013. The Session Law included various budget provisions, and also included a separate provision, Section 10.19, that did not reduce funding for any particular program, but instead specifically prohibited only Planned Parenthood, Inc. and its affiliates from receiving any funding for programs administered by DHHS. The entire provision reads as follows:

> **PROHIBIT USE OF ALL FUNDS FOR PLANNED PARENTHOOD ORGANIZATIONS - SECTION 10.19. For fiscal years 2011-2012 and 2012-2013, the Department of Health and Human Services may not provide State funds or other funds administered by the Department for contracts or grants to Planned Parenthood, Inc., and affiliated organizations.**

This Section did not cut funding across the board for certain women's health or low-income health services, and does not have any budgetary impact for the state. Moreover, Section 10.19 did not address funding for abortion services, as funding for abortion services is already limited by state and federal law. See 42 U.S.C. § 300a-6 (prohibiting the use of Title X funds "in programs where abortion is a method of family planning"); N.C. Sess. Laws 2011-145 § 29.23(a) (prohibiting the use of state funds for most abortions). Instead, Section 10.19 provides that for funding that will otherwise continue for certain non-abortion-related state and federal health

programs, Planned Parenthood is specifically prohibited from receiving that funding. Thus, any other entity could still receive funding for these programs, but Planned Parenthood, Inc. and its affiliated organizations cannot, solely because of the operation of Section 10.19.

Plaintiff contends that Section 10.19 affects PPCNC's Title X funding, the Teen Pregnancy Prevention Grant, and the Women's Health Grant. Plaintiff has presented evidence to establish that prior to the passage of Session Law 2011-145 containing Section 10.19, DHHS had preliminarily approved funding for at least two of these programs to PPCNC. Specifically with respect to Title X funding, Plaintiff has presented evidence to establish that in November 2010, as the result of a competitive contracting process, DHHS informed PPCNC that PPCNC's application was approved for funding in the amount of $125,000, effective July 1, 2011, for fiscal year 2011-2012. At the preliminary injunction hearing, counsel for Defendant stated that funds, although available to Defendant, were not being provided to PPCNC due to Section 10.19.

Shortly after passage of this legislation, Plaintiff filed the present suit, contending that Section 10.19 is unconstitutional under the United States Constitution for multiple reasons, including violation of the First Amendment and Due Process Clause of the Fourteenth Amendment, violation of the prohibition against Bills of Attainder, violation of the Equal Protection Clause, and violation of the Supremacy Clause. Plaintiff also filed a Motion for Preliminary Injunction, contending that PPCNC would suffer irreparable harm unless enforcement of Section 10.19 is enjoined. After a hearing on Plaintiff's Motion for Preliminary Injunction, the Court concluded that Plaintiff had shown a likelihood of success as to all of its

constitutional claims and a likelihood that Plaintiff would suffer irreparable harm in the absence of an injunction. In addition, the Court concluded that Plaintiff had shown that the balance of equities tipped in favor of granting preliminary injunctive relief and that the public interest would be better served by enjoining Section 10.19. Based on these conclusions, the Court enjoined Defendant from further enforcement of or reliance on Section 10.19 during the pendency of this suit.

Following entry of the Preliminary Injunction Order, Defendant executed contracts with PPCNC for the family planning services described herein in the following amounts: $125,000 in Title X funds, $75,000 in Teen Pregnancy Prevention Project funds, and $12,000 in Women's Health Grant funds. The parties then filed the present Motions for Summary Judgment, each seeking judgment as a matter of law on the constitutional claims raised by Plaintiff in this case. In addition, Plaintiff asks the Court to permanently enjoin any further enforcement of or reliance on Section 10.19.

II.    DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56, the court shall grant summary judgment when there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Zahodnick v. Int'l Bus. Machs. Corp., 135 F.3d 911, 913 (4th Cir. 1997). When making a summary judgment determination, the court must view the evidence and all justifiable inferences from the evidence in the light most favorable to the non-moving party. Zahodnick, 135 F.3d at 913. "'[W]here the facts and the law will reasonably support only one conclusion,'" summary judgment is appropriate. PSINet, Inc. v. Chapman,

6

362 F.3d 227, 233 (4th Cir. 2004) (quoting Hawkins v. PepsiCO, Inc., 203 F.3d 274, 279 (4th Cir. 2000)).

As noted above, in its present Motion for Summary Judgment and Permanent Injunction, Plaintiff contends that Section 10.19 is unconstitutional under the United States Constitution in violation of the First Amendment and Due Process Clause of the Fourteenth Amendment, the prohibition against Bills of Attainder, the Equal Protection Clause, and the Supremacy Clause. Based on its constitutional claims, Plaintiff seeks declaratory and permanent injunctive relief against Defendant. In response to Plaintiff's Motion, and in his own Motion for Summary Judgment, Defendant contests the merits of each of Plaintiff's constitutional claims, as discussed in detail below. The Court notes, however, that Defendant first contends that, regardless of the merits, Plaintiff's claims are barred by the Eleventh Amendment to the United States Constitution, and summary judgment should therefore be entered in favor of Defendant as to all claims. As such, prior to discussing the merits of Plaintiff's constitutional claims, the Court will address Defendant's Eleventh Amendment arguments.

A.      Eleventh Amendment Issues

The Eleventh Amendment bars damages actions against unconsenting states in federal court. See U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."). The Supreme Court, in Ex Parte Young, however, recognized an exception to the general Eleventh Amendment rule in that the Eleventh Amendment does not bar actions against a state

7

official to enjoin future or ongoing violations of federal law.  See Ex parte Young, 209 U.S. 123,

28 S. Ct. 441, 454, 52 L. Ed. 2d 714 (1908), Antrican v. Odom, 290 F.3d 178, 184 (4th Cir. 2002)

(noting that the Ex Parte Young exception "allows private citizens, in proper cases, to petition

a federal court to enjoin State officials in their official capacities from engaging in future conduct

that would violate the Constitution or a federal statute").  Although Defendant recognizes Ex

Parte Young as providing a valid exception to the general rule, Defendant contends that the Ex

Parte Young exception does not apply in this case because, according to Defendant, Plaintiff

seeks retroactive relief from the State in the form of funding contracts that did not previously

exist.  As such, Defendant contends that the relief allegedly sought by Plaintiff, and preliminarily

granted by this Court, impermissibly mandates that the State enter into such funding contracts

in violation of the Eleventh Amendment.

In support of his contention, Defendant relies primarily on the language in footnote 7

of the Preliminary Injunction Order.  Footnote 7 states in relevant part:

> At the preliminary injunction hearing, counsel for Defendant Cansler noted that the
> reason that the contracts had not been finalized and the funding had not been provided
> was because of Section 10.19.  Having now enjoined enforcement of Section 10.19, the
> Court expects Defendant Cansler to follow all applicable state and federal laws and
> regulations, without relying on the prohibition in Section 10.19.  If Defendant Cansler
> takes action that is still a result of reliance on or enforcement of Section 10.19, either
> explicitly or implicitly, further proceedings would be appropriate to determine Defendant
> Cansler's compliance with the Court's Order.

(Prelim. Inj. Order at 35 n.7, [Doc. #30]).  Defendant contends that footnote 7 expressly

mandates that the State "enter into a contract not of its own making, and spend public money

in a certain way, not merely ancillary to the primary relief requested, but as the very object of the

relief requested."  (Def.'s Br. at 7-8, [Doc. #47]).  In other words, Defendant contends that the

8

Preliminary Injunction Order required Defendant to "pay Plaintiff the money or come back to Court." (Def.'s Br. at 8, [Doc. #47]).

In considering Defendant's Eleventh Amendment arguments, the Court notes that Defendant mis-characterizes the relief sought by Plaintiff, and that preliminarily granted by the Court, as mandatory injunctive relief requiring the State to enter into a contract with or otherwise provide funding to Plaintiff. As the Court discussed in the Preliminary Injunction Order, and as remains true at the present stage of this litigation, "Plaintiff has made it clear in the present case that it seeks [prospective] injunctive relief . . . to prevent Defendant Cansler from enforcing state legislation that violates the federal constitution" and does not seek "retroactive injunctive or monetary relief." (Prelim. Inj. Order at 13, 14, [Doc. #30]). In preliminarily granting Plaintiff the prospective relief sought, the Court did not require Defendant to enter into a contract with or provide funding to any party. Rather, the Court merely prohibited Defendant from enforcing or relying on Section 10.19 in the course of choosing whomever he intends to contract with going forward, and required nothing further from Defendant.[3] See Antrican, 290 F.3d at 186 (noting that "the proper focus must be directed at

_____

[3] At the preliminary injunction hearing, the Court expressly posed a question to counsel for Defendant regarding the potential implications of granting the relief sought by Plaintiff in this case. Specifically, the Court asked counsel for Defendant what course of action Defendant would take if the Court granted Plaintiff's request for a preliminary injunction. In response, counsel for Defendant stated:

> If [the Court] stopped the enforcement of [Section] 10.19 and said nothing further, then it would be up to DHHS as to whether or not they presented those remaining funds to the other delegates that had applied; but there would be a decision on the State making that decision, not a decision by this Court ordering them to enter into a contract.

9

whether the injunctive relief sought is prospective or retroactive in nature"); see also Pinehurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 102-03, 104 S. Ct. 900, 909, 79 L. Ed. 2d 67 (1984) (noting that under Edelman v. Jordan, 415 U.S. 651, 94 S. Ct. 1347, 39 L. Ed. 2d 662 (1974), "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief"). Therefore, the Court finds that the language in footnote 7 of the Preliminary Injunction Order does not require anything of Defendant other than that he refrain from enforcing or relying on Section 10.19 in the course of contracting for family planning services. Furthermore, the Court finds that the fact that Defendant chose to execute contracts with Plaintiff following entry of the Preliminary Injunction Order does not transform the prospective injunctive relief sought by Plaintiff, and preliminarily granted by the Court, into relief of a nature that would be barred by the Eleventh Amendment. As such, based on the relief sought in this case, and that which the Court preliminary granted, the Court concludes that Plaintiff's claims are not barred by the Eleventh Amendment.

Having concluded that the Eleventh Amendment does not bar Plaintiff's claims in this case, the Court will now address the merits of those claims. As noted above, Plaintiff contends that Section 10.19 is unconstitutional under the United States Constitution in violation of the First Amendment and Due Process Clause of the Fourteenth Amendment, the prohibition against Bills of Attainder, the Equal Protection Clause, and the Supremacy Clause. The Court

_____

(August 10, 2011, Hr'g Tr. at 45-46, [Doc. #33]). In view of this statement, the Court notes that the Preliminary Injunction Order comports with Defendant counsel's understanding of the relief sought by Plaintiff in this case.

will address each contention in turn.

B.    First Amendment and Due Process Clause

Plaintiff first contends that Section 10.19 violates the First Amendment and the Due Process Clause of the Fourteenth Amendment by "target[ing] Planned Parenthood for unfavorable treatment based on its constitutionally protected activity as an abortion rights advocate and provider." (Pl.'s Reply at 1, [Doc. #57]).  Plaintiff contends that because the First Amendment protects Plaintiff's right to "advocate for reproductive choice and abortion rights," the State could not directly restrain Plaintiff's pro-choice activities without violating the Constitution.  (Pl.'s Br. at 6, [Doc. #43] (citing Planned Parenthood of Cent. & N. Ariz. v. Arizona, 718 F.2d 938, 942-44 (9th Cir. 1983), wherein the Ninth Circuit concluded that, although the state need not fund abortions, the state "may not unreasonably interfere with the right of Planned Parenthood to engage in abortion or abortion-related speech activities")). Plaintiff further contends that although it is not a direct restraint on speech, Section 10.19's categorical exclusion of Planned Parenthood from DHHS-administered grants and contracts operates to interfere with Plaintiff's First Amendment rights such that Section 10.19 impermissibly "allow[s] the government to 'produce a result which [it] could not command directly.'" Perry v. Sindermann, 408 U.S. 593, 597, 92 S. Ct. 2694, 2697, 33 L. Ed. 2d 570 (1972) (internal citation omitted).  In addition, Plaintiff contends that Section 10.19 violates the Due Process Clause of the Fourteenth Amendment because it "unconstitutionally penalizes PPCNC for engaging in the constitutionally protected activity of providing abortion services." (Pl.'s Br. at 9, [Doc. #43] (citing Planned Parenthood of Cent. Tex. v. Sanchez, 280 F. Supp. 2d 590, 608

11

(W.D. Tex. 2003), as acknowledging that "abortion providers have some constitutionally-protected right, derived from the patients' rights, to perform the services that are necessary to enable women to exercise their own constitutional rights")).

In response, Defendant contends that, as a direct grantee of Title X funds, Defendant has broad discretion to choose with whom it will contract regarding distribution of those funds. Defendant contends that the prohibition in Section 10.19 is merely an exercise of that discretion, based on the State's objective in favoring childbirth over abortion, and is not a violation of any constitutional rights. In addition, Defendant contends, as he does in response to several of Plaintiff's claims herein, that Section 10.19 does not completely bar Plaintiff from applying for Title X funds, because Plaintiff can choose to apply directly to the federal government for such funds. In that regard, Defendant contends that Plaintiff does not have a right to receive federal funding, but rather only has a right to apply for federal funding as a direct grantee, which Defendant contends Section 10.19 does not impede. As such, Defendant contends that Section 10.19 does not infringe any "constitutionally-protected activities under the First Amendment or the Fourteenth Amendment Due Process Clause." (Def.'s Resp. at 3, [Doc. #53]; Def.'s Br. at 13-14, [Doc. #47]).

In considering the parties' contentions, the Court notes that the Supreme Court has recognized an "unconstitutional conditions" doctrine whereby "even though a person has no 'right' to a valuable governmental benefit . . . . [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests–especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his

12

constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." Perry, 408 U.S. at 597, 92 S. Ct. at 2697; see also O'Hare Truck Servs., Inc. v. City of Northlake, 518 U.S. 712, 725-26, 116 S. Ct. 2353, 2361, 135 L. Ed. 2d 874 (1996) ("Government officials may indeed terminate at-will relationships, unmodified by any legal constraints, without cause; but it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views."). In that regard, the Supreme Court in Rust v. Sullivan recognized the distinction between conditions placed on federally-funded *programs* and those placed on the *recipients* of federal funds. In doing so, the Supreme Court noted that government action would violate the unconstitutional conditions doctrine where it "placed a condition on the recipient of the subsidy rather than on a particular program or service, thus effectively prohibiting the recipient from engaging in the protected conduct outside the scope of the federally funded program." Rust v. Sullivan, 500 U.S. 173, 197, 111 S. Ct. 1759, 1774, 114 L. Ed. 2d 233 (1991). Therefore, as it relates to the present case, although the State may choose not to fund abortions or abortion-related services, the State may not "condition participation in a government program or receipt of a government benefit, [such as DHHS-administered contracts and grants], upon an applicant's exercise of protected rights," such as the right to advocate for and provide abortion-related services. Planned Parenthood Ass'n. of Hidalgo County Tex., Inc. v. Suehs, 828 F. Supp. 2d 872, 882 (W.D. Tex. 2012); see also Planned Parenthood of Mid-Missouri and E. Kan. v. Dempsey, 167 F.3d 458, 463-64 (8th Cir. 1999) (holding that a state statute excluding abortion providers from receiving state family planning funds would be an unconstitutional penalty under Rust, unless construed to allow

13

grantees to create independent affiliates that could perform abortions); <u>Planned Parenthood of Cent. and N. Ariz. v. Arizona</u>, 718 F.2d 938, 945 (9th Cir. 1983) (holding that a state statute could "forbid entities receiving state funds from using those funds for abortions and the related activities," but rejecting the contention that a state could refuse to fund otherwise eligible activities "merely because they engage in abortion-related activities disfavored by the state," and remanding for a determination of whether withdrawal of all state funds was the only way to ensure that state funds were not used for abortion-related activities); <u>Planned Parenthood of Kansas, Inc. v. City of Wichita</u>, 729 F. Supp. 1282, 1287-88 (D. Kan. 1990) (holding that a local government decision not to provide funding for family planning programs to Planned Parenthood was unconstitutional "viewpoint based discrimination" that singled out Planned Parenthood "on the basis of its advocacy of certain unpopular ideals" in violation of the First Amendment).

In the present case, it is undisputed that only Planned Parenthood and its affiliates are excluded from DHHS-administered contracts and grants under Section 10.19. It is also undisputed that Planned Parenthood is an entity that would be otherwise eligible to receive funding, but for Section 10.19. Moreover, although Defendant contends that Section 10.19 operates merely as an exercise of discretion with regard to funding decisions, based on the State's objective in favoring childbirth over abortion, it is undisputed that the government funding at issue in this case would not be used to fund abortion-related services or advocacy. In that regard, the Court notes that Defendant has provided no evidence that the funding prohibition in Section 10.19 is necessary to ensure that government funds are not used for

14

abortion-related services, as both federal and North Carolina legislation already exist to bar government funds from being used for abortion-related services. Furthermore, Defendant has presented no evidence or even allegation that Plaintiff would use, or has ever used, government funds for abortion-related services. Rather, "there is no dispute that Section 10.19 prohibits Planned Parenthood and its affiliated organizations, including PPCNC, from receiving funding for non-abortion-related projects based on their other activities for which they have not sought funding." (Prelim. Inj. Order at 20, [Doc. #30]). Therefore, based on the evidence before the Court, and the line of precedent described herein, the Court finds that Section 10.19 limits access to government funding for Plaintiff, as a recipient[4], in a manner that impedes Plaintiff's constitutional rights, and which is not necessary to serve a compelling government interest. Dempsey, 167 F.3d at 461 ("[F]unding classifications that interfere with the exercise of constitutional rights must be necessary to promote a compelling interest." (internal quotations and citations omitted)).

In so finding, the Court notes that Defendant contends that the "unconstitutional condition" cases, such as Rust and Perry, do not apply in the instant case because Plaintiff is not a true "beneficiary" of federal funding, but rather is merely a service provider with the right to

---

[4] The Court notes that Defendant quotes Rust in an attempt to support its contention that Section 10.19 is a constitutional measure implemented to forward the State's interest in favoring childbirth over abortion. (See Def.'s Resp. at 2-3, [Doc. #53] (quoting Rust, 500 U.S. at 193, 111 S. Ct. at 1772 ("The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest, without at the same time funding an alternative program which seeks to deal with the problem in another way."))). However, in doing so, Defendant fails to recognize the very distinction at issue in this case, that is, the distinction between placing conditions on a federally-funded program or project and placing conditions or limits on a recipient of federal funding.

15

apply for funding. However, the Court finds that the Supreme Court has not so limited the unconstitutional conditions doctrine. Rather, the Supreme Court has expressly recognized constitutional protections for entities seeking federal contracts or funding so that they may provide various services to others. See, e.g., O'Hare, 518 U.S. at 725-26, 116 S. Ct. at 2360-61 (recognizing First Amendment protections for the plaintiff, a private towing service seeking to maintain government contracts to provide that service to the community); Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 686, 116 S. Ct 2342, 2352, 135 L. Ed. 2d 843 (1996) (recognizing First Amendment protections for the plaintiff, an independent contractor who provided trash hauling services and was seeking to maintain his government contracts to continue providing that service); see also Rust, 500 U.S. 173, 111 S. Ct. 1759 (addressing First Amendment challenges by a group of plaintiffs that included family planing services providers seeking to continue providing such services to others). As such, based on all of the information before the Court, the Court concludes that Section 10.19 violates Plaintiff's constitutional rights under the First Amendment and Due Process Clause of the Fourteenth Amendment, and Plaintiff is entitled to judgment as a matter of law on this claim.

     C.    <u>Bills of Attainder</u>

Plaintiff next contends that Section 10.19 violates the prohibition against Bills of Attainder in that it singles out Plaintiff for punishment based on its position as a an advocate for reproductive rights and provider of abortion services. "A legislative act is an unconstitutional bill of attainder if it singles out an individual or narrow class of persons for punishment without a judicial proceeding." <u>Lynn v. West</u>, 134 F.3d 582, 594 n.11 (4th Cir.

1998); see also U.S. Const. art. I, § 10 ("No State shall . . . pass any Bill of Attainder."). The Supreme Court has held that "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function, or more simply - trial by legislature." United States v. Brown, 381 U.S. 437, 442, 85 S. Ct. 1707, 1711-12, 14 L. Ed. 2d 484 (1965). Thus, legislative bodies must accomplish their objectives by "rules of general applicability" and "cannot specify the people upon whom the sanction it prescribes is to be levied." Id. at 461, 85 S. Ct. at 1722; see also Communist Party of the United States v. Subversive Activities Control Bd., 367 U.S. 1, 86, 81 S. Ct. 1357, 1405, 6 L. Ed. 2d 625 (1961) ("The singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons."). "To constitute a bill of attainder, the statute must (1) specify affected persons, (2) impose punishment, and (3) fail to provide for a judicial trial." Dempsey, 167 F.3d at 465. "To rise to the level of 'punishment' under the Bill of Attainder Clause, harm must fall within the traditional meaning of legislative punishment, fail to further a nonpunitive purpose, or be based on a congressional intent to punish." Id. (citing Selective Serv. Sys. v. Minn. Pub. Interest Research Grp., 468 U.S. 841, 852, 104 S. Ct. 3348, 3355, 82 L. Ed. 2d 632 (1984) and Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 473-76, 97 S. Ct. 2777, 2805-07, 53 L. Ed. 2d 867 (1977)).[5]

---

[5] This overview of the prohibition against Bills of Attainder is taken from the Preliminary Injunction Order. The law set forth in the overview has not changed since entry of the Preliminary Injunction Order and remain valid with regard to the Court's analysis of the parties'

In support of its claim, Plaintiff contends that Section 10.19 fits all three definitions of "punishment," as set forth above. With regard to whether Section 10.19 falls within the traditional meaning of legislative punishment, Plaintiff contends that historically, legislation which excludes the affected person or entity from certain employment or vocations has been associated with punishment. (Pl.'s Br. at 12 , [Doc. #43] (citing Nixon v. Adm'r of Gen. Servs., 433 U.S. 425, 474-75, 97 S. Ct. 2777, 2806, 53 L. Ed. 2d 867 (1977)). In that regard, Plaintiff contends that Section 10.19's categorical disqualification of Planned Parenthood and its affiliates from receiving DHHS-administered contracts and grants effectively amounts to a "'proscription from any opportunity to serve' the public," and is therefore punitive in nature. (Pl.'s Reply at 5, [Doc. #57] (quoting United States v. Lovett, 328 U.S. 303, 316, 66 S. Ct. 1073, 1079, 90 L. Ed. 2d 1252 (1946)). Plaintiff further contends that, even if Section 10.19 does not comport with a traditional understanding of punishment, it fails to further a nonpunitive purpose, and imposes burdens on Plaintiff that are "'extraordinar[ily] imbalance[d]'" with any alleged nonpunitive objective. (Pl.'s Br. at 13 [Doc. #43] (quoting Foretich v. United States, 351 F.3d 1198, 1223-24 (D.C. Cir. 2003)). Specifically, Plaintiff contends that the objective allegedly furthered by Section 10.19, that is, the State's proffered interest in favoring childbirth over abortion, "bears no rational relationship to legislation that strips one specific provider of access to funds earmarked for n*on-abortion* services," particularly because "PPCNC would continue to be excluded from funds administered by DHHS, even were it to discontinue providing abortions." (Pl.'s Br. at 13, [Doc. #43]) (emphasis in original)). Finally, Plaintiff contends that the legislative history

_____

present Motions.

surrounding the passage of Section 10.19 evidences a punitive legislative intent, based on statements made by supporters of Section 10.19. Specifically, Plaintiff contends that supporters of Section 10.19 "assailed [Planned Parenthood] as 'unsavory'" and "invoked the supposed wrongdoing that Planned Parenthood and its founder, Margaret Sanger, allegedly engaged in decades ago." (Pl.'s Br. at 14, [Doc. #43]).

In response, Defendant contends that Section 10.19 does not meet the traditional definitions of punishment, in that Section 10.19 does not exclude Plaintiff from engaging in its choice of employment or vocation. Specifically, Defendant contends that Section 10.19 does not prohibit Plaintiff from continuing to provide abortion services and, as Defendant contends throughout its briefing on the present Motions, that nothing in Section 10.19 prohibits Plaintiff from applying directly to the federal government for Title X funds. Defendant raises those same contentions in support of its position that Section 10.19 furthers "the legislature's nonpunitive purpose of favoring childbirth over abortion," and that Section 10.19 does not inordinately burden Plaintiff with regard to reaching the stated objective. (Def.'s Resp. at 9, [Doc. #53]). In arguing that Section 10.19 furthers a nonpunitive state interest, Defendant analogizes Section 10.19 to the legislation upheld in Dempsey, contending that the Eighth Circuit found therein that a "State's nonpunitive interest of removing [the] State's imprimatur from abortion services and encouraging childbirth over abortion was served by a statute that prohibited organizations or affiliates which provided or promoted abortions from receiving family planning funds, and conclud[ed] that [the] statute was not intended to punish Planned Parenthood for its abortion activities." (Def.'s Resp. at 9, [Doc. #53] (citing Dempsey, 167 F.3d at 463-65)). Furthermore,

19

Defendant contends that the legislative history of Section 10.19 does not evidence a legislative intent to punish Planned Parenthood. Rather, Defendant contends that statements made in support of Section 10.19 "simply reflect an interest in ensuring that funding was available for needed services and that the funding was provided to entities that could carry out those services." (Def's Resp. at 10-11, [Doc. #53]).

In considering the parties' contentions on Plaintiff's Bill of Attainder claim, the Court notes once again that this case does not in any way involve funding for abortion services. In that regard, the Court notes that the present issue before the Court is not whether Section 10.19 impermissibly excludes Planned Parenthood and its affiliates from government grants or contracts for funding to continue providing abortions. Rather, the issue before the Court is whether Section 10.19 impermissibly excludes Planned Parenthood and its affiliates from government grants or contracts that would necessarily be used to continue providing *non-abortion-related services*. It is the non-abortion-related services that Plaintiff seeks the opportunity to provide to the community and which it contends are threatened by Planned Parenthood's categorical exclusion from DHHS-administered grants and contracts under Section 10.19. As such, the Court finds Defendant's repeated assertions that Section 10.19 is not punitive in nature because it does not prohibit Plaintiff from continuing to provide abortions, inapposite to the discussion herein, and the Court will not consider those assertions further.

With regard to whether Section 10.19 is punitive under any of the aforementioned tests, the Court turns first to a discussion of <u>Dempsey</u>, as the Eighth Circuit's opinion provides a pertinent distinction to the present case which warrants elaboration. As the Court expressly

20

noted in the Preliminary Injunction Order, and reiterates here, "[t]he Eighth Circuit held that the denial of a noncontractual government benefit will not be deemed punishment if the statute leaves open perpetually the possibility of qualifying for aid. The Eighth Circuit construed the statute in <u>Dempsey</u> to allow Planned Parenthood to qualify for family planning funds by establishing an independent affiliate to perform abortion services. However, in the present case, Section 10.19 does not allow Planned Parenthood to qualify for family planning funds by establishing an independent affiliate to perform abortion services. Instead, as noted above, Section 10.19 explicitly excludes Planned Parenthood, Inc. *and its affiliated organizations* from any funding administered by DHHS." (Prelim. Inj. Order at 24, [Doc. #30] (internal citations and quotations omitted)). Therefore, although, as Defendant notes, the Eighth Circuit found that the statute in <u>Dempsey</u> was not a Bill of Attainder, <u>Dempsey</u> would not support a similar finding in this case with regard to Section 10.19's effect on Planned Parenthood, because Section 10.19 fails to meet the primary criterion on which the Eighth Circuit based its decision. <u>Dempsey</u>, 167 F.3d at 465 ("[The statute] allows Planned Parenthood to qualify for family-planning funds by establishing an independent affiliate to perform its abortion services. *Accordingly*, it does not fall within the traditional meaning of legislative punishment." (emphasis added)).

Rather, the evidence in this case establishes that Section 10.19 singles out and excludes Planned Parenthood, *and its affiliates*, from any opportunity to apply for and/or receive DHHS-administered grants and contracts for non-abortion-related services, which Planned Parenthood had effectively provided to the public in the past. <u>See</u> <u>Florida Youth Conservation Corps. v. Stutler</u>, No. 4:06CV275, 2006 WL 1835967, at *1 (N.D. Fla. June 30, 2006) (noting that the

effect of the unconstitutional legislation "would be to put plaintiff out of business, or at least to put plaintiff out of the business in which it has been engaged to date"). The Court finds that such a categorical exclusion is analogous to legislation that prohibits a person or entity from engaging in certain employment, which courts have historically found to be associated with punishment. See Nixon, 433 U.S. at 474-75, 97 S. Ct. at 2806; see also Florida Youth Conservation Corps., 2006 WL 1835967, at *2 (noting that "plaintiff has in effect been found guilty of an unspecified charge and, as its sentence, has been barred from state contracting" and that "this legislative action is very much akin to the enactments that prompted the framers to include in the Constitution a prohibition on bills of attainder"). As such, the Court concludes that Section 10.19 is punitive in nature based on a traditional understanding of punishment.

In addition, with regard to whether Section 10.19 furthers a nonpunitive interest, the Court notes that, given that the only alleged nonpunitive interest is the State's interest in favoring childbirth over abortion, Defendant fails to explain how categorically excluding Planned Parenthood from applying for or receiving DHHS-administered contracts or grants for *non-abortion-related* services furthers that interest. As noted above, none of the contracts or associated funding from which Planned Parenthood is excluded have anything to do with funding abortions. In addition, as noted above, Defendant does not contend that PPCNC has improperly used any state funds for abortions or that a total contracting ban against Planned Parenthood and its affiliates is needed to ensure that funds administered by DHHS are not used for abortion services. Therefore, the Court concludes that Section 10.19 does not further the State's asserted nonpunitive interest of favoring childbirth over abortions, and the State has

22

provided no other purportedly nonpunitive basis for the application of Section 10.19.

Moreover, as noted in the Preliminary Injunction, and based on facts which have not changed, the Court finds that the legislative history supports the conclusion that Section 10.19 was intended to single out and punish Planned Parenthood and its affiliated organizations. Specifically, the legislative history establishes that Representative Paul Stam, the Majority Leader in the North Carolina House of Representatives, spoke in support of Section 10.19 during legislative debate, asserting that Section 10.19 was appropriate because Planned Parenthood had "particularly unsavory origins in the eugenics movement which was so deleterious in North Carolina" and because of "the connection of Margaret Sanger, the founder of Planned Parenthood, with the eugenics movement." (Pl.'s Br. Ex. 3G, at 5-6, [Doc. #43-5]). Representative Stam further stated that Section 10.19 was appropriate because "Planned Parenthood in general, and Margaret Sanger in particular, its founders, were the driving force behind that [eugenics] effort" and "we should not be rewarding the perpetrators of that program." (Pl.'s Br. Ex. 3J, at 4-5, [Doc. #43-7]). Senator Warren Daniel also spoke in support of Section 10.19 in the North Carolina Senate, stating that "I just point out to this body that 97 percent of the pregnant women that go to a Planned Parenthood clinic are sold an abortion. Recent year's statistics show 332,227 abortions were performed by Planned Parenthood. Only 977 adoption referrals. I think that's an appalling statistic, and I'm not interested in the constituents in my district funding an organization with these kind of numbers." (Pl.'s Br. Ex. 3H, at 4, [Doc. #43-6]).

Although Defendant contends that certain statements made in support of Section 10.19

23

reflect the purportedly nonpunitive interest of "ensuring that funding was available for needed services and that the funding was provided to entities that could carry out those services," the Court does not find such an argument persuasive. Rather, the Court notes that Defendant has failed to legitimately explain why, if the stated nonpunitive interest were the true basis for enforcing Section 10.19, the legislation would exclude Planned Parenthood from applying to DHHS for the funding necessary to provide those services, where Planned Parenthood is undisputedly an entity that had capably provided the "needed services" for many years in the past, and is an entity that DHHS had chosen to continue providing such services prior to the passage of Section 10.19. Therefore, based on all of the information before the Court, the Court finds that Section 10.19 was adopted specifically to penalize Planned Parenthood and its affiliated organizations for its separate abortion-related activities. As such the Court concludes that Section 10.19 is an unconstitutional Bill of Attainder, and Plaintiff is entitled to judgment as a matter of law on its claim.

> D.  Equal Protection Clause

Based on similar contentions as those set forth in its Bill of Attainder claim, Plaintiff contends that Section 10.19 violates the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause of the Fourteenth Amendment provides that "no State shall 'deny to any person within its jurisdiction the equal protection of the laws,'" thereby directing "that all persons similarly situated should be treated alike." City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985) (quoting U.S. Const. amend. XIV). Where legislation creates distinctions among groups, that legislation must, at a

minimum, "bear a rational relationship to an independent and legitimate legislative end" in order to "ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." Romer v. Evans, 517 U.S. 620, 632-33, 116 S. Ct. 1620, 1627, 134 L. Ed. 2d 855 (1996) (finding that "even in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the relation between the classification adopted and the object to be attained"). In that regard, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." City of Cleburne, 473 U.S. at 446-47, 105 S. Ct. at 3258 (internal quotations and citations omitted) (noting that "objectives–such as 'a bare . . . desire to harm a politically unpopular group'–are not legitimate state interests" (internal citations omitted)).

In the present case, Plaintiff contends that Section 10.19 singles out Planned Parenthood for unfavorable treatment because of its status as a pro-choice organization. Plaintiff contends that Section 10.19's exclusion of Planned Parenthood from DHHS-administered grants and contracts fails to rationally relate to the State's asserted interest of favoring child birth over abortion. Specifically, Plaintiff contends, as it did in its Bill of Attainder claim, that the funding that Plaintiff is excluded from receiving has nothing to do with abortions or abortion-related services. Rather, the funding at issue could and would only ever be used for non-abortion-related family planning services. As such, Plaintiff contends that excluding Plaintiff from non-abortion-related funding cannot rationally relate to the State's interest in favoring childbirth over abortion.

In response, Defendant contends, without explanation, that Section 10.19 does advance

25

the legitimate state interest in favoring child birth over abortion. In addition, Defendant contends that Plaintiff has failed to "demonstrate that [it] has been treated differently from others with whom [it] is similarly situated," because Plaintiff cannot point to any other abortion providers that currently receive Title X funds as administered by DHHS. (Def.'s Resp. at 11-13, [Doc. #53] (internal quotations and citations omitted)). Therefore, Defendant contends that Section 10.19 meets constitutional muster under the rational basis test and does not violate the Equal Protection Clause. As such, Defendant contends that "Plaintiff's proper mode of redress for this kind of grievance would be to challenge the General Assembly's policy by engaging the political process, not by filing an equal protection law suit in federal court." (Def.'s Resp. at 15-16, [Doc. #53]).

In considering this claim, the Court first notes that neither party disputes that Planned Parenthood would be an entity eligible for DHHS-administered grants and contracts but for Section 10.19. In fact, the parties do not dispute that prior to the passage of Section 10.19, PPCNC was selected through a competitive bidding process involving other eligible entities to enter into family planning contracts with DHHS, as it had been selected in years past. Therefore, because Section 10.19 excludes, by name, only Planned Parenthood and its affiliated organizations, the Court finds that the comparison group of those "similarly situated" to Planned Parenthood encompasses all other persons or entities that might be eligible for DHHS-administered grants or contracts. With that comparison group in mind, the Court turns to whether Section 10.19's exclusion of Planned Parenthood, only, from DHHS-administered

26

grants and contracts rationally relates to a legitimate government interest.[6] As stated throughout this Memorandum Opinion, the State contends that Section 10.19 furthers the State's interest of favoring childbirth over abortion. In that regard, the Court notes that the State may legitimately preference child birth over abortion in certain circumstances. For example, the State may choose to fund childbirth services and choose not to fund abortion services. See Maher v. Roe, 432 U.S. 464, 478, 97 S. Ct. 2376, 2385, 53 L. Ed. 2d 484 (1977) (noting that in choosing to fund childbirth services but not abortion services, the state was furthering its "legitimate interest in encouraging normal childbirth"). As such, the State's interest in favoring childbirth over abortion would indeed provide a basis for prohibiting state funds from being used for abortion services, and there is no dispute that North Carolina has already prohibited state funding of abortions. However, as was the case at the preliminary injunction stage of these proceedings, Defendant has not presented any grounds to conclude that the State's interest in favoring childbirth over abortions would provide a basis for the complete contracting ban contained in Section 10.19, which prohibits PPCNC from receiving funding for non-abortion-related services for which PPCNC would otherwise be eligible. In this regard, as was noted in the prior section of this Memorandum Opinion, the Court notes that there is no evidence or contention that such a complete ban is necessary to prevent state funds from being used to fund abortion services, since Defendant concedes that there is no evidence or even allegation that

---

[6] The Court notes that Plaintiff initially argues that the Court should apply a strict scrutiny analysis to determine whether Section 10.19 violates the Equal Protection Clause. However, because the Court finds, as discussed herein, that Section 10.19 does not meet constitutional muster under even the rational basis test, the Court need not address the outcome under a strict scrutiny analysis.

PPCNC has improperly used any state or federal funding for abortion services. Thus, Defendant has not presented any evidence or even contention to establish how Section 10.19's ban on using PPCNC for non-abortion-related projects is rationally related to a legislative policy of funding childbirth services over abortion services. See Planned Parenthood of Kansas, Inc., 729 F. Supp. at 1290-91 (concluding that legislation precluding the City from contracting with Planned Parenthood violated the Equal Protection Clause because "[t]he resolution was adopted in retaliation for the plaintiffs' pursuit of constitutionally-protected activities, and the record is devoid of a legitimate rationale which would justify the distinction between Planned Parenthood and other family planning organizations"); Planned Parenthood of Minnesota v. Minnesota, 612 F.2d 359, 360-61 (8th Cir. 1980) (concluding that legislation prohibiting family planning grants to "any nonprofit corporation which performs abortions" violated the Equal Protection Clause where there was no evidence that Planned Parenthood improperly used federal or state funding for abortion services and there was "no rational distinction between [Planned Parenthood] and any other non-profit corporation with respect to the providing of pre-pregnancy family planning services"). Moreover, as noted above, the legislative history provides further evidence that Section 10.19 was passed for the purpose of penalizing Planned Parenthood and its affiliates. See Romer, 517 U.S. at 634, 116 S. Ct. at 1628 ("'[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.'" (quoting Dep't of Agric. v. Moreno, 413 U.S. 528, 534, 93 S. Ct. 2821, 2826, 37 L. Ed. 2d 782 (1973)). Therefore, based on all of the evidence before the Court, the Court concludes that

28

Section 10.19 is unconstitutional in violation of the Equal Protection Clause, and Plaintiff is entitled to judgment as a matter of law on its Equal Protection claim.

E.    Supremacy Clause

Finally, Plaintiff contends that Section 10.19 violates the Supremacy Clause in that it conflicts with and is therefore preempted by Title X. Plaintiff asserts its Supremacy Clause claim both pursuant to 42 U.S.C. § 1983 and directly under the Supremacy Clause.[7]  The Supremacy Clause, Article VI, cl. 2 of the United States Constitution, provides that the Constitution and laws of the United States "shall be the supreme Law of the Land" notwithstanding any contrary state law. In this case, Plaintiff contends that Section 10.19 is contrary to and in conflict with the provisions of Title X and is therefore invalid under the Supremacy Clause. As noted above, Title X of the Public Health Service Act is a federal program providing funds for family planning services for low-income or uninsured women and families. Under 42 U.S.C. § 300(a), the federal Department of Health and Human Services provides grants and enters into contracts with "public or nonprofit private entities" to establish and operate family planning projects. The criteria are set out in 42 U.S.C. § 300(b):

> In making grants and contracts under this section the Secretary shall take into account the number of patients to be served, the extent to which family planning services are needed locally, the relative need of the applicant, and its capacity to make rapid and effective use of such assistance.

---

[7]  As noted in footnote 1, supra, Plaintiff has filed a Motion to amend its Complaint to include more specific language regarding the bases on which it brings the Supremacy Clause challenge. However, as concluded in footnote 1, Plaintiff need not amend its Complaint for the Court to consider and resolve Plaintiff's Supremacy Clause challenge both pursuant to 42 U.S.C. § 1983 and as brought directly under the Supremacy Clause.

The federal regulations likewise provide that "[a]ny public or nonprofit private entity in a State may apply for a grant under this subpart" and specifically require only that a project must "[p]rovide a broad range of acceptable and effective medically approved family planning methods (including natural family planning methods) and services (including infertility services and services for adolescents)." 42 C.F.R. §§ 59.3, 59.5. Title X funds, however, may not be used to fund abortion services. See 42 U.S.C. § 300a-6; 42 C.F.R. § 59.5(a)(5). But Title X does not contain any provision that would prohibit entities that provide abortions from receiving Title X funds for non-abortion-related services. See Planned Parenthood of Houston and Southeast Texas v. Sanchez, 403 F.3d 324, 340 (5th Cir. 2005) ("Under Title X, then, abortion providers are eligible to receive family planning funding; Title X requires only that they use that funding for legitimate Title X purposes."). Title X funds may be provided directly from the federal Department of Health and Human Services to a service provider, or may be provided to a grantee who contracts with service providers. North Carolina is a Title X grantee, and North Carolina has previously contracted with service providers, including Plaintiff PPCNC, to provide non-abortion-related family planning services under Title X.[8]

Plaintiff contends that Section 10.19 conflicts with the Supremacy Clause because Section 10.19 adds an additional eligibility criteria for receiving Title X funding, to the extent that it singles out and excludes Planned Parenthood and its affiliates from receiving Title X funding

---

[8] This overview of the Supremacy Clause and the provisions of Title X is taken from the Preliminary Injunction Order. The facts and law set forth in the overview have not changed since entry of the Preliminary Injunction Order and remain valid with regard to the Court's analysis of the parties' present Motions.

administered by DHHS. In response to Plaintiff's position, and in his own Motion for Summary Judgment, Defendant contends that Plaintiff cannot bring the present Supremacy Clause claim either pursuant to 42 U.S.C. § 1983 or directly under the Supremacy Clause. In addition, Defendant contends that even if Plaintiff could bring a Supremacy Clause challenge in this case, such a challenge would fail, as Section 10.19 does not conflict with and is not preempted by Title X. The Court will consider the parties contentions herein.

          i.    <u>Availability of a Claim pursuant to 42 U.S.C. § 1983 or directly under the Supremacy Clause</u>

With regard to whether Plaintiff may bring the present Supremacy Clause challenge pursuant to 42 U.S.C. § 1983 or directly under the Supremacy Clause, the Court first notes that the briefing for both parties on this subject is nearly identical to that at the preliminary injunction stage. Moreover, based on a review of the relevant legal principles, and the unchanged factual circumstances of this case, the Court notes that the analysis of the parties' contentions on summary judgment would be substantially similar to that set forth in the Preliminary Injunction Order. As such, the Court finds no need to reiterate the entire analysis in full within this Memorandum Opinion, and will instead incorporate by reference that analysis herein. (See Prelim. Inj. Order at 8-12, [Doc. #30]).

The Court will, however, expand on the analysis set forth in the Preliminary Injunction Order as follows. The Court notes that, based on the case law set forth in the Preliminary Injunction Order, the Court found that "the present weight of authority and the current law of the Fourth Circuit would support the conclusion that Plaintiff in the present case can raise a claim under the Supremacy Clause for declaratory and injunctive relief based on the contention

31

that a state statute, here Section 10.19, is preempted by Title X, even if Plaintiff could not assert a claim under 42 U.S.C. § 1983." (Prelim. Inj. Order at 12, [Doc. #30]). In so finding, the Court recognized that the Supreme Court had granted certiorari in the case then entitled <u>Maxwell-Jolly v. Independent Living Center of Southern California, Inc.</u>, 131 S. Ct. 992, 178 L. Ed. 2d 824 (2011), "to resolve the question of whether individuals may assert a direct cause of action under the Supremacy Clause to enforce federal Spending Clause statutes against states under a preemption theory." (Prelim. Inj. Order at 12, [Doc. #30]). Following the parties' briefing on the present Motions, the Supreme Court issued its opinion in that case, now entitled <u>Douglas v. Independent Living Center of Southern California, Inc.</u>, 132 S. Ct. 1204, 182 L. Ed. 2d 101 (2012). However, because the federal agency issued an approval as to certain of the underlying state statutes after the Supreme Court heard oral arguments, the Supreme Court remanded the case to the Ninth Circuit for further proceedings in light of the changed factual circumstances. As such, the opinion in <u>Douglas</u> neither provides additional support for nor undermines the precedent used as a part of this Court's Supremacy Clause analysis in the Preliminary Injunction Order. Therefore, absent a Supreme Court decision to the contrary, the Court finds no reason to disturb the Court's previous finding that "Plaintiff in the present case can raise a claim under the Supremacy Clause for declaratory and injunctive relief based on the contention that a state statute, here Section 10.19, is preempted by Title X, even if Plaintiff could not assert a claim under 42 U.S.C. § 1983." (Prelim. Inj. Order at 12, [Doc.#30]). As such, the Court concludes that Plaintiff may bring, and has properly brought, a claim alleging that Section 10.19 violates the Supremacy Clause in this case.

32

ii.    Preemption of Section 10.19 by Title X

Concluding that Plaintiff may bring its Supremacy Clause claim in this case, the Court

will now address whether Section 10.19 conflicts with and is preempted by Title X.  As noted

above, Plaintiff contends that because under Title X, "'*[a]ny* public or nonprofit private entity

in a State may apply for a grant,'" Section 10.19's categorical exclusion of Planned Parenthood

and affiliates, which are entities otherwise eligible for Title X funds, from DHHS-administered

Title X funds, impermissibly adds an eligibility criteria for federal family planning services grants.

(Pl.'s Br. at 17, [Doc. #43] (quoting 42 C.F.R. § 59.3 (emphasis added))).  In support of its

contention, Plaintiff notes that multiple other courts, such as the Fifth Circuit in Planned

Parenthood of Houston and Southeast Texas v. Sanchez, have found that "a state eligibility

standard that altogether excludes entities that might otherwise be eligible for federal funds is

invalid under the Supremacy Clause." Sanchez, 403 F.3d 324, 336-42 (5th Cir. 2005) (holding

that a state statute that prohibited distribution of family planning funds to entities that perform

abortions would be inconsistent with Title X and in violation of the Supremacy Clause to the

extent that the state statute excluded otherwise eligible entities from receiving funding for family

planning programs, but the state statute would be constitutional if the state statute were

construed to authorize entities to receive family planning funding if the entities created

"affiliates" that provided the abortion services, in order to keep the family planning programs

separated from the abortion services); see also Valley Family Planning v. North Dakota, 661

F.2d 99, 100 (8th Cir. 1981) (holding that a state statute withholding Title X funds from any

entity that performs, refers or encourages abortions was in conflict with Title X and was

33

therefore invalid under the Supremacy Clause); Planned Parenthood of Kansas and Mid-Missouri v. Brownback, 799 F. Supp. 2d 1218, 1232 (D. Kan. 2011) (holding that a state statute that operated to exclude Planned Parenthood from receiving federal Title X funding administered by the state was invalid under the Supremacy Clause); Planned Parenthood of Billings, Inc. v. Montana, 648 F. Supp. 47, 51 (D. Mont. 1986) (striking down a state law which added a requirement that for any Title X funds distributed by the state, any abortions must occur in a physically separate facility from the family planning services funded by Title X). Based on these, and other, cases, Plaintiff contends that courts that have "consider[ed] legislation like Section 10.19[,] which bars otherwise eligible entities from becoming Title X subgrantees[, have] ruled that [such legislation] violates the Supremacy Clause." (Pl.'s Reply at 10, [Doc. #57]). As such, Plaintiff asks that the Court "follow that unbroken line of precedent and invalidate Section 10.19." (Pl.'s Reply at 10, [Doc. #57]).

In response, although Defendant agrees that "states are not permitted to establish eligibility standards for federal assistance programs that conflict with the existing federal statutory or regulatory scheme," Defendant contends that Section 10.19 does not impose additional eligibility standards, and therefore is neither in conflict with nor preempted by Title X. (Def.'s Resp. at 16, [Doc. #53]). Specifically, Defendant contends, as he has throughout the briefing on the present Motions, that Section 10.19 does not conflict with Title X because Plaintiff remains able to apply directly to the federal government for family planning funding. In that regard, Defendant contends that Plaintiff's decision not to "undertake [the] legal and financial responsibility of being a [direct] Grantee in North Carolina does not make it 'ineligible'

to apply for [Title X] funds." (Def.'s Resp. at 18, [Doc. #53]).  Moreover, Defendant contends that nothing in Section 10.19 undermines Congress's objective under Title X to provide family planning services to low income beneficiaries because such services will continue to be provided. As a corollary to that argument, Defendant contends, as it did in opposition to Plaintiff's First Amendment claim, that although Plaintiff may have a right to apply for funding as a direct grantee, it has no right to receive such funding, as it is not a "beneficiary" of a federal program with a right to receive a federal benefit.

In support of its contention that Section 10.19 does not violate the Supremacy Clause, Defendant does not point to any cases in which a provision similar to Section 10.19 was upheld as being constitutional.  Rather, Defendant attempts to distinguish certain cases where the court invalidated a state statute under the Supremacy Clause by contending that each of those cases involved legislation that added eligibility requirements with regard to the individual recipients of the government services, or the ultimate "beneficiaries", and not with regard to the service provider entity seeking the funding as grantees or subgrantees. However, the Court notes that Defendant does not distinguish the cases noted above, or any others, where courts *do* address the Supremacy Clause preemption question with regard to state statutes that exclude entities seeking Title X funds as grantees or subgrantees.[9]  In addition, with regard to Defendant's

_____

[9] The Court notes that Defendant does cite to <u>Sanchez</u> in support of its contention that Section 10.19 does not violate the Supremacy Clause in this case.  However, although the Fifth circuit in <u>Sanchez</u> concluded that the statutes at issue in that case could be rendered constitutional if the statute was interpreted to allow the creation of affiliates to perform the abortion services, in the present case Defendant has not argued that Section 10.19 can be construed in that manner.  Indeed, as noted above, Section 10.19 by its very language prohibits funding for Planned Parenthood and its affiliated organizations.  Thus, Section 10.19 directly

35

contention that because Plaintiff can apply directly to the federal government for Title X funds, Section 10.19 does not render Plaintiff "ineligible", the Court notes first that at the time this action was filed, the process for applying for and obtaining funding for the 2011-2012 fiscal year had already passed. As noted above, for the 2011-2012 fiscal year, Plaintiff applied for Title X funding through DHHS and was successful in that process and was awarded funds through the state's Title X grant. It is those funds that were initially withheld pursuant to Section 10.19, and Plaintiff would not have had the opportunity to obtain Title X funds directly from the federal government for the 2011-2012 fiscal year.[10] Moreover, even if Plaintiff could apply directly to the federal government in future years, the state still would not be free to add additional criteria for Title X funding administered by the state. See Planned Parenthood of Kansas, 799 F. Supp. 2d at 1231 (concluding that "[i]t is irrelevant that Planned Parenthood might—after considerable delay and damage—obtain a direct grant of funding from HHS in some future year" because the Title X eligibility standards apply not just to direct grantees, but also to subgrantees of a state). Therefore, the Court concludes once again that the fact that Plaintiff may, at some point in the future, be able to apply directly for Title X funding does not mean that the state may now or in the future impose additional eligibility criteria or exclusions with respect to the Title X funding administered by the state. Therefore, based on the foregoing, the Court finds that Section 10.19

forecloses the one distinguishing basis that Sanchez suggested for construing a provision such as Section 10.19 to render it constitutional.

[10] As noted above, Section 10.19, were it not preliminarily enjoined, would have applied to the 2012-2013 fiscal year as well. However, the Court does not presently have before it any information regarding contracts or grants sought by or provided to any entity for the 2012-2013 fiscal year.

violates the Supremacy Clause, in that it impermissibly limits the distribution of federal Title X funds administered by DHHS. As such, the Court concludes Plaintiff is entitled to judgment as a matter of law on this claim.

Based on the foregoing discussion, the Court concludes that Plaintiff is entitled to judgment as a matter of law on all of its claims, as set forth herein. As such, the Court will now address Plaintiff's request for a permanent injunction in this case.

III.    PERMANENT INJUNCTION

A party seeking permanent injunction must demonstrate "'(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'" Christopher Phelps & Assocs., LLC v. Galloway, 492 F.3d 532, 543 (4th Cir. 2007) (quoting eBay Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed. 2d 641 (2006)). As discussed below, Plaintiff correctly contends that all four factors favor granting permanent injunctive relief in this case.

With regard to the question of irreparable harm, Plaintiff has provided undisputed evidence that, prior to the execution of the family planning contracts in August of 2011, Plaintiff was forced to stop providing free long-lasting contraceptives to low-income women as a result of Section 10.19. In addition, Plaintiff has presented evidence that any continued enforcement of Section 10.19 will force Plaintiff to close its Durham clinic thereby laying off staff members and making it more difficult for women in need of the medical services provided by Plaintiff to

37

obtain that care promptly. Based on the evidence presented in this case, Plaintiff has undisputedly shown that it has suffered, and will continue to suffer, irreparable harm in the absence of an injunction in this case. Furthermore, remedies at law would not serve to compensate Plaintiff, as Plaintiff would remain ineligible to apply for DHHS-administered grants and contracts should application of Section 10.19 be allowed.

In addition, although Plaintiff has and will continue to suffer irreparable harm in the absence of an injunction, Defendant will suffer no such harm upon entry of permanent injunctive relief in this case. As noted above, the injunctive relief sought by Plaintiff, and preliminarily granted by the Court, is not mandatory in nature, and would not require the State, or any agency within the State, to enter into contracts with Plaintiff or any other entity. Furthermore, Defendant has provided no evidence that Section 10.19 provides any budgetary effect such that enjoining Section 10.19 would result in straining the state budget in any way. Rather, a permanent injunction of Section 10.19 would simply place Planned Parenthood, and its affiliated organizations, on the same footing as all other eligible entities who seek to apply for DHHS-administered grants and contracts. As such, the Court finds that the balance of hardships favors permanently enjoining Section 10.19 in this case.

Finally, the Court finds that the public interest would not be disserved by permanently enjoining Section 10.19. As noted in the Preliminary Injunction Order, and based on factual circumstances that have not changed, "Plaintiff is providing women's health and teen pregnancy prevention services already funded by the state and the federal government, separate from any abortion services. If Section 10.19 is enforced, Plaintiff would have to cease providing those

38

non-abortion-related health services. Such action would result in the public having less access to health services, including family planning services, particularly for low income women." (Prelim. Inj. Order at 33-34, [Doc. #30]). In addition, as counsel for Defendant agreed with Plaintiff at the Preliminary Injunction hearing, and has not effectively disputed for purposes of the present Motions, that it may be more difficult for individuals to obtain health services if PPCNC is forced to close its Durham clinic as a result of Section 10.19. Therefore, based on the foregoing, the Court concludes that Plaintiff has demonstrated that all four factors noted above favor entry of a permanent injunction in this case. As such, the Court will grant Plaintiff's request for a permanent injunction and will, therefore, permanently enjoin Defendant from any further enforcement of or reliance on Section 10.19 of North Carolina Session Law 2011-145.

IV.     CONCLUSION

Based on these determinations, the Court concludes that Plaintiff's Motion for Summary Judgment and Permanent Injunction should be granted and Defendant's Motion for Summary Judgment should be denied. As such, the Court will issue a Declaratory Judgment declaring that Section 10.19 of North Carolina Session Law 2011-145 violates the United States Constitution, as set forth herein, and enjoin Defendant from any further enforcement of or reliance on Section 10.19. As a result, Defendant Cansler may not enforce Section 10.19 by singling out Planned Parenthood, Inc. and its affiliated organizations for exclusion from programs funded by the state or funded by the federal government and administered by DHHS for non-abortion related services.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Summary Judgment and Permanent Injunction [Doc. #42] is hereby GRANTED, and Defendant's Motion for Summary Judgment [Doc. #46] is hereby DENIED. IT IS DECLARED that Section 10.19 of North

Carolina Session Law 2011-145 violates the United States Constitution, as set forth herein, and Defendant is hereby ENJOINED from any further enforcement of or reliance on Section 10.19 of North Carolina Session Law 2011-145.

FINALLY, IT IS ORDERED that Plaintiff's Motion for Leave to File an Amended Complaint for Injunctive and Declaratory Relief [Doc. #41] is hereby DENIED.

A Judgment will be filed contemporaneously herewith.

This the 28th day of June, 2012.

United States District Judge